## HAYNES *v.* WASHINGTON.

No. 147.   Argued February 26–27, 1963.—Decided May 27, 1963.

*Lawrence Speiser* argued the cause for petitioner. With him on the briefs were *Francis Hoague* and *William W. Ross.*

*George A. Kain* argued the cause for respondent. With him on the briefs were *Joseph J. Rekofke* and *John J. Lally.*

Mr. Justice Goldberg delivered the opinion of the Court.

The petitioner, Raymond L. Haynes, was tried in a Superior Court of the State of Washington on a charge of robbery, found guilty by a jury, and sentenced to imprisonment "for a term of not more than 20 years." The Washington Supreme Court affirmed the conviction, with four of nine judges dissenting. 58 Wash. 2d 716; 364 P. 2d 935. Certiorari was granted, 370 U. S. 902, to consider whether the admission of the petitioner's written and signed confession into evidence against him at trial constituted a denial of due process of law.

Haynes contends that the confession was involuntary, and thus constitutionally inadmissible, because induced by police threats and promises. He testified at trial that during the approximately 16-hour period between the time of his arrest and the making and signing of the written confession, he several times asked police to allow him to call an attorney and to call his wife. He said that such requests were uniformly refused and that he was repeatedly told that he would not be allowed to call unless and until he "cooperated" with police and gave them a written and signed confession admitting participation in the robbery. He was not permitted to phone his wife, or for that matter anyone, either on the night of his arrest or the next day. The police persisted in their refusals to allow him contact with the outside world, he said, even after he signed one written confession and after a preliminary hearing before a magistrate, late on the day following his arrest. According to the petitioner, he was, in fact, held incommunicado by the police until some five or seven days after his arrest.[1]

---

[1] Haynes makes no claim that he was physically abused, deprived of food or rest, or subjected to uninterrupted questioning for prolonged periods.

The State asserts that the petitioner's version of events is contradicted, that the confession was freely given, and that, in any event, the question of voluntariness was conclusively resolved against the petitioner by the verdict of the jury at trial. We consider each of these contentions in turn.

## I.

The petitioner was charged with robbing a gasoline service station in the City of Spokane, Washington, at about 9 p. m. on Thursday, December 19, 1957. He was arrested by Spokane police in the vicinity of the station within approximately one-half hour after the crime.[2] Though he orally admitted the robbery to officers while en route to the police station, he was, on arrival there, not charged with the crime, but instead booked for "investigation," or, as it is locally called, placed on the "small book." Concededly, prisoners held on the "small book" are permitted by police neither to make phone calls nor to have any visitors.[3]

Shortly after arriving at the station at about 10 p. m., the petitioner was questioned for about one-half hour by Lieutenant Wakeley of the Spokane police, during which period he again orally admitted the crime. He was then placed in a line-up and identified by witnesses as one of the robbers. Apparently, nothing else was done that night.

On the following morning, beginning at approximately 9:30 a. m., the petitioner was again questioned for about an hour and a half, this time by Detectives Peck and

---

[2] The petitioner's brother, Keith Haynes, had been arrested a few minutes earlier. Though also charged with, and convicted of, participation in the robbery of the service station, he does not seek review of his conviction here.

[3] Apparently recognizing the questionable nature of such a practice, the Spokane police, we are told, have since abandoned use of the "small book" and the attendant restrictive practices.

Cockburn. He once more orally admitted the robbery, and a written confession was transcribed. Shortly thereafter, he was taken to the office of the deputy prosecutor, where still another statement was taken and transcribed. Though Haynes refused to sign this second confession, he then did sign the earlier statement given to Detectives Peck and Cockburn.[4] Later that same afternoon he was taken before a magistrate for a preliminary hearing; this was at about 4 p. m. on December 20, the day after his arrest.

At the conclusion of the hearing, Haynes was transferred to the county jail and on either the following Tuesday or Thursday was returned to the deputy prosecutor's office. He was again asked to sign the second statement which he had given there some four to six days earlier, but again refused to do so.

The written confession taken from Haynes by Detectives Peck and Cockburn on the morning after his arrest and signed by Haynes on the same day in the deputy prosecutor's office was introduced into evidence against the petitioner over proper and timely objection by his counsel that such use would violate due process of law. Under the Washington procedure then in effect,[5] voluntariness of the confession was treated as a question of fact

---

[4] The written confession appears to indicate on its face that it was signed shortly before 2 p. m. on December 20, about 16¼ hours after Haynes was arrested. The State asserts in its brief, however, that the total time of detention prior to signing of the confession was "17 to 19" hours. We assume, for purposes here, that the 16-hour period is sufficiently accurate.

[5] Washington has since revised its rules of practice to provide for a preliminary hearing by the trial court, out of the presence of the jury, on the issue of voluntariness of a confession. See 58 Wash. 2d, at 720, 364 P. 2d, at 937, and Rules of Pleading, Practice and Procedure, Wash. Rev. Code, Rule 101.20W, Vol. O, as amended, effective January 2, 1961.

for ultimate determination by the jury. In overruling the petitioner's objection to use of the confession, 'the trial judge, however, made an apparently preliminary determination that it was voluntary and "conditionally" admissible. See 58 Wash. 2d, at 719–720, 364 P. 2d, at 937. The evidence going to voluntariness was heard before the jury and the issue submitted to it. The jury returned a general verdict of guilty and was not required to, and did not, indicate its view with respect to the voluntariness of the confession.

## II.

The State first contends that the petitioner's version of the circumstances surrounding the making and signing of his written confession is evidentially contradicted and thus should be rejected by this Court. We have carefully reviewed the entire record, however, and find that Haynes' account is uncontradicted in its essential elements.

Haynes testified that on the evening of his arrest he made several specific requests of the police that he be permitted to call an attorney and to call his wife. Each such request, he said, was refused. He stated, however, that he was told he might make a call if he confessed:

> "They kept wanting me to own up to robbing a Richfield Service Station and I asked Mr. [Detective] Pike several times if I could call a lawyer and he said if I cooperated and gave him a statement : . . that I would be allowed to call, to make a phone call . . . ."

On cross-examination, Lieutenant Wakeley, the officer who interrogated the petitioner on the night of his arrest, first said that Haynes did not ask him for permission to call his wife, but merely inquired whether his wife would be notified of his arrest. Lieutenant Wakeley said that

he told the petitioner that his wife would be notified.[6] Defense counsel, however, pursued the point and, only a moment later, Wakeley testified that Haynes "may have" asked permission to call his wife himself; Wakeley said he didn't "remember exactly whether he asked or whether we wouldn't notify his wife." Wakeley then testified that he simply didn't "remember" whether Haynes asked to call his wife so that she might secure a lawyer for him; in addition, the lieutenant admitted that the petitioner might have asked to call his wife after the interrogation was completed. Detective Pike, also testifying at trial, said simply that he had not talked to Haynes on the evening of the arrest.

If this were the only evidence of police coercion and inducement in the record, we would face the problem of determining whether, in view of the testimony of Lieutenant Wakeley and Detective Pike, the petitioner's own testimony would be sufficient, on review by this Court, to establish the existence of impermissible police conduct barring use of the written confession ultimately obtained. We need not pursue such an inquiry, however, since the record contains other probative, convincing, and uncontradicted evidence.

The written confession introduced at trial was dictated and transcribed while Haynes was being questioned by Detectives Peck and Cockburn on the morning of December 20, the day after the robbery. Haynes testified:

"Q. . . . [S]tate whether or not the officers at that time asked you to give them a statement. A. Yes.

---

[6] There is no indication that she was actually so notified. In fact, the petitioner's wife telephoned police at about noon on the day following the robbery, but was refused any information beyond the fact that her husband was being held. Though she identified herself and asked specifically why her husband was in jail, she was told simply "to get the morning paper and read it."

"Q. And what was your answer to that? A. I wanted to call my wife.

"Q. And were you allowed to call your wife? A. No.

"Q. . . . This was on Friday? A. Friday.

"Q. December 20th? A. Yes.·

"Q. And was anything else said with respect to making a telephone call? A. Mr. Pike [sic] and the other officer both told me that when I had made a statement and cooperated with them that they would see to it that as soon as I got booked I could call my wife.

"Q. Well, that was the night before you were told that, wasn't it? A. I was told that the next day too, several times.

"Q. Who were the officers that were with you? A. Oh, not Mr. Pike. Mr. Cockburn and Mr. Peck, I believe.

"Q. In any event, Mr. Haynes, did you soon after that give them a statement? A. Well, not readily.

"Q. Did you give them a statement? A. Yes."

The transcribed statement itself discloses that early in the interrogation Haynes asked whether he might at least talk to the prosecutor before proceeding further. He was told: "We just want to get this down for our records, and then we will go to the prosecutor's office and he will ask the same questions that I am."

Whatever contradiction of Haynes' account of his interrogation on the night of his arrest might be found in the testimony of Lieutenant Wakeley and Detective Pike, his explicit description of the circumstances surrounding his questioning and the taking by Detectives Peck and Cockburn of the challenged confession on the following day remains testimonially undisputed. Though he took the stand at trial, Detective Cockburn did not deny that he or Detective Peck had told the petitioner that he might

call his wife only if he "cooperated" and gave the police a statement. Cockburn said merely that he could not "remember" whether Haynes had asked to call his wife. He conceded that the petitioner "could have" made such a request. No legal alchemy can transmute such wholly equivocal testimony into a denial or refutation of the petitioner's specific recitation of events. Detective Peck did not testify and no other evidence was presented to contradict the petitioner's testimony, either as part of the prosecution's case in chief or, even more importantly, by way of rebuttal subsequent to the petitioner's testimony. We cannot but attribute significance to the failure of the State, after listening to the petitioner's direct and explicit testimony, to attempt to contradict that crucial evidence; this testimonial void is the more meaningful in light of the availability and willing cooperation of the policemen who, if honestly able to do so, could have readily denied the defendant's claims. Similarly, no evidence was offered to contradict in any way the petitioner's testimony that when first taken to the deputy prosecutor's office to sign the statement he had given to Detectives Peck and Cockburn he again requested permission to call his wife and was again refused.[7]

Though the police were in possession of evidence more than adequate to justify his being charged without delay, it is uncontroverted that Haynes was not taken before a magistrate and granted a preliminary hearing until he had acceded to demands that he give and sign the written statement. Nor is there any indication in the record that prior to signing the written confession, or even thereafter,

---

[7] The petitioner's incommunicado detention was in contravention of an explicit Washington statute, Wash. Rev. Code, § 9.33.020 (5), which prohibits and makes it a misdemeanor for police to "refuse permission to [an] . . . arrested person to communicate with his friends or with an attorney" when the refusal has as its purpose the obtaining of a confession.

Haynes was advised by authorities of his right to remain silent, warned that his answers might be used against him, or told of his rights respecting consultation with an attorney.

In addition, there is no contradiction of Haynes' testimony that even after he submitted and supplied the written confession used at trial, the police nonetheless continued the incommunicado detention while persisting in efforts to secure still another signature on another statement.[8] Upon being returned to the deputy prosecutor's office during the week following his arrest and while still being held incommunicado, the petitioner was again asked to sign the second statement which he had given there several days earlier. He refused to do so, he said, because, as he then told the deputy prosecutor, "all the promises of all the officers I had talked to had not been fulfilled and I had not been able to call my wife and I would sign nothing under any conditions until I was allowed to call my wife to see about legal counsel." The State offered no evidence to rebut this testimony.[9] Similarly uncontradicted is Haynes' testimony that it was not until

---

[8] While occurring after completion of the signed confession here challenged, such action not only tends to bear out petitioner's version of what happened earlier but displays and confirms an official disregard by police of state law, see note 7, *supra,* and of the basic rights of the defendant. See *Haley* v. *Ohio,* 332 U. S. 596, 600 (opinion of Mr. Justice Douglas). The police "were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny . . . ." *Spano* v. *New York,* 360 U. S. 315, 324.

[9] Though the deputy prosecutor himself appeared as a witness for the State at the trial, his testimony was in no way directed to this statement made in his office or the attendant circumstances and he was not recalled to the stand after Haynes testified so that he might controvert the petitioner's version of events.

during or after this second interview with the prosecutor on the Tuesday or Thursday—Haynes could not be quite certain—but, in any event, some five or seven days after his arrest, that he was first allowed to call his wife.

The contested written confession itself contains the following exchange:

"Q. Have we made you any threats or promises? A. No.

"Q. Has [sic] any police officers made you any promises or threats? A. No—except that the Lieutenant promised me that as soon as I was booked that I could call my wife.

"Q. You are being held for investigation—you haven't been booked yet. When you are, you will be able to phone your wife."

The State argues that the quoted answers to the first two of these questions conclusively negative existence of coercion or inducement on the part of the police. The statement bears no such reading, however. The questions on their face disclose that the petitioner was told that "booking" was a prerequisite to calling his wife, and "booking" must mean booking on a charge of robbery. Since the police already had enough evidence to warrant charging the petitioner with the robbery—they had the petitioner's prior oral admissions, the circumstances surrounding his arrest, and his identification by witnesses—the only fair inference to be drawn under all the circumstances is that he would not be booked on the robbery charge until the police had secured the additional evidence they desired, the signed statement for which they were pressing. The quoted portions of the signed confession thus support the petitioner's version of events; under any view, they offer no viable or reliable contradiction.

Even were it otherwise, there would be substantial doubt as to the probative effect to be accorded recita-

tions in the challenged confession that it was not involuntarily induced. Cf. *Haley* v. *Ohio,* 332 U. S. 596, 601 (opinion of MR. JUSTICE DOUGLAS). It would be anomalous, indeed, if such a statement, contained within the very document asserted to have been obtained by use of impermissible coercive pressures, was itself enough to create an evidentiary conflict precluding this Court's effective review of the constitutional issue. Common sense dictates the conclusion that if the authorities were successful in compelling the totally incriminating confession of guilt, the very issue for determination, they would have little, if any, trouble securing the self-contained concession of voluntariness. Certainly, we cannot accord any conclusive import to such an admission, particularly when, as here, it is immediately followed by recitations supporting the petitioner's version of events.

## III.

The uncontroverted portions of the record thus disclose that the petitioner's written confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities. We have only recently held again that a confession obtained by police through the use of threats is violative of due process and that "the question in each case is whether the defendant's will was overborne at the time he confessed," *Lynumn* v. *Illinois,* 372 U. S. 528, 534. "In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort." *Wilson* v. *United States,* 162 U. S. 613, 623. See also *Bram* v. *United States,* 168 U. S. 532. And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances. See, *e. g., Leyra*

v. *Denno,* 347 U. S. 556, 558.[10]   Haynes' undisputed testimony as to the making and signing of the challenged confession used against him at trial permits no doubt that it was obtained under a totality of circumstances evidencing an involuntary written admission of guilt.

Here, as in *Lynumn, supra,* the petitioner was alone in the hands of the police, with no one to advise or aid him, and he had "no reason not to believe that the police had ample power to carry out their threats," 372 U. S., at 534, to continue, for a much longer period if need be, the incommunicado detention—as in fact was actually done. Neither the petitioner's prior contacts with the authorities nor the fact that he previously had made incriminating oral admissions negatives the existence and effectiveness of the coercive tactics used in securing the written confession introduced at trial.   The petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands.   Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family, Haynes understandably chose to make and sign the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth Amendment.

We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects.   Of course, detection and solution of crime is, at best, a diffi-

---

[10] See also *Fikes* v. *Alabama,* 352 U. S. 191, 197–198; *Gallegos* v. *Nebraska,* 342 U. S. 55, 65 (opinion of Mr. Justice Reed).

cult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated. We are here impelled to the conclusion, from all of the facts presented, that the bounds of due process have been exceeded.

## IV.

Our conclusion is in no way foreclosed, as the State contends, by the fact that the state trial judge or the jury may have reached a different result on this issue.

It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148; "we cannot escape the responsibility of making our own examination of the record," *Spano* v. *New York,* 360 U. S. 315, 316. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our re-

sponsibilities by permitting ourselves to be "completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding." *Stein* v. *New York,* 346 U. S. 156, 181. As state courts are, in instances such as this, charged with the primary responsibility of protecting basic and essential rights, we accord an appropriate and substantial effect to their resolutions of conflicts in evidence as to the occurrence or nonoccurrence of factual events and happenings. This is particularly apposite because the trial judge and jury are closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony. But, as declared in *Ward* v. *Texas,* 316 U. S. 547, 550, "when, as in this case, the question is properly raised as to whether a defendant has been denied the due process of law . . . we cannot be precluded by the verdict of a jury from determining whether the circumstances under which the confession was made were such that its admission in evidence amounts to a denial of due process." To the same effect, see, *e. g., Spano* v. *New York,* 360 U. S. 315; *Thomas* v. *Arizona,* 356 U. S. 390, 393; *Payne* v. *Arkansas,* 356 U. S. 560, 562, 568; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148; *Lisenba* v. *California,* 314 U. S. 219, 237–238; *Chambers* v. *Florida,* 309 U. S. 227, 228.

Beyond even the compelling nature of our precedents, however, there is here still another reason for refusing to consider the present inquiry foreclosed by the verdict of the jury to which the issue of voluntariness of the confession was submitted. The jury was instructed, in effect, not to consider as relevant on the issue of voluntariness of the confession the fact that a defendant is not reminded that he is under arrest, that he is not cautioned that he may remain silent, that he is not warned that his answers may be used against him, or that he is not advised that

he is entitled to counsel.[11]   Whatever independent consequence these factors may otherwise have, they are unquestionably attendant circumstances which the accused is entitled to have appropriately considered in determining voluntariness and admissibility of his confession.[12]

In addition, the trial court instructed in terms of a Washington statute which permits consideration of a corroborated confession "made under inducement" and excepts only confessions "made under the influence of fear produced by threats."[13]   It seems reasonably clear from this portion of the instructions that the jury may well have been misled as to the requisite constitutional standard, notwithstanding the apparent propriety of other portions of the instructions.   Given the fact that the jury did no more than return a general verdict of guilty, we obviously have no way of knowing whether it found the confession to be voluntary and admissible or not.   Be-

---

[11] The trial court told the jury:

"And in this connection, I further instruct you that a confession or admission of a defendant is not rendered involuntary because he is not at the time of making the same reminded that he was under arrest, or that he was not obliged to reply, or that his answers would be used against him, or that he was entitled to be represented by counsel."

That the jury was to take this as precluding consideration of the cited factors is evidenced by the immediately succeeding instruction which advised that it *should* consider a denial of communication with friends or an attorney in connection with determining whether the written confession was voluntary or not.

[12] See note 10, *supra*.

[13] The instruction commenced:

"By statute of the State of Washington, it is provided:

" 'The confession of a defendant made under inducement, with all the circumstances, may be given as evidence against him, except when made under the influence of fear produced by threats; but a confession made under inducement is not sufficient to warrant a conviction without corroborating testimony.' "

cause there was sufficient other evidence to sustain the verdict, the jury may have found the defendant guilty even though it rejected the confession as involuntary; alternatively, the jury may have based its finding of guilt on the confession, reasoning, under the questionable instructions and the Washington statute, that the confession was admissible as voluntary, even though improperly induced, because it was corroborated by the other evidence. Although, for the reasons indicated, the Washington statute and the quoted instructions raise a serious and substantial question whether a proper constitutional standard was applied by the jury, we need not rely on the imperfections in the instructions as a separate ground of reversal. We think it clear, however, that these imperfections are entirely sufficient to preclude any dependence we might otherwise place on the jury verdict as settling the issue of voluntariness here.

## V.

In reaching the conclusion which we do, we are not unmindful of substantial independent evidence tending to demonstrate the guilt of the petitioner. As was said in *Rogers v. Richmond*, 365 U. S. 534, 541:

> "Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement."

Of course, we neither express nor suggest a view with regard to the ultimate guilt or innocence of the petitioner here; that is for a jury to decide on a new trial free of

constitutional infirmity, which the State is at liberty to order.

This case illustrates a particular facet of police utilization of improper methods. While history amply shows that confessions have often been extorted to save law enforcement officials the trouble and effort of obtaining valid and independent evidence, the coercive devices used here were designed to obtain admissions which would incontrovertibly complete a case in which there had already been obtained, by proper investigative efforts, competent evidence sufficient to sustain a conviction. The procedures here are no less constitutionally impermissible, and perhaps more unwarranted because so unnecessary. There is no reasonable or rational basis for claiming that the oppressive and unfair methods utilized were in any way essential to the detection or solution of the crime or to the protection of the public. The claim, so often made in the context of coerced confession cases, that the devices employed by the authorities were requisite to solution of the crime and successful prosecution of the guilty party cannot here be made.

Official overzealousness of the type which vitiates the petitioner's conviction below has only deleterious effects. Here it has put the State to the substantial additional expense of prosecuting the case through the appellate courts and, now, will require even a greater expenditure in the event of retrial, as is likely. But it is the deprivation of the protected rights themselves which is fundamental and the most regrettable, not only because of the effect on the individual defendant, but because of the effect on our system of law and justice. Whether there is involved the brutal "third degree," or the more subtle, but no less offensive, methods here obtaining, official misconduct cannot but breed disrespect for law, as well as for those charged with its enforcement.

The judgment below is vacated and the case is remanded to the Supreme Court of Washington for further proceedings not inconsistent herewith.

*It is so ordered.*

Mr. Justice Clark, with whom Mr. Justice Harlan, Mr. Justice Stewart and Mr. Justice White join, dissenting.

On December 19, 1957, at 9:05 p. m., a report was received by the Spokane Police Station that a filling station robbery was in progress in a certain area of the city. The report was broadcast to police cars working in the area. Twenty-five minutes later uniformed officers riding in a police car near the scene of the reported robbery observed petitioner walking down the street. As they approached him he went into the yard of a home in the vicinity. The police drove up and called to petitioner, who was questioned for a moment by one of the officers. Petitioner indicated that "he lived there" and, after talking with the officers, walked onto the porch of the house and began fumbling with the screen door as if to unlock it. The officer remained at the curb observing petitioner, who in a few moments returned to the car and spontaneously exclaimed to the officers, "You got me, let's go." He was placed in the police car, admitted the robbery to the officers and, as they drove to the filling station, identified it as the place he had robbed. He was taken to the police station where he arrived within 20 minutes of his arrest and made a second oral confession to Lieutenant Wakeley, who was in charge of the detective office on the 4 o'clock to midnight shift. This confession was related by the lieutenant at the trial, without objection, in the following testimony:

> "A. [By Lt. Wakeley.] He said they decided to hold up a place so they drove around to find some

place that didn't seem to have any customers and they didn't know the streets, didn't know the town very well. They said they were out where they found the car. They drove by and saw a service station which didn't seem to have any business, so they parked the car in the alley and walked into the service station, and Raymond said that he told the man it was a holdup and his brother stood behind the man and he got the money from the service station operator. He didn't think his brother got any of it. After they held up the place they ran out the door and he ran down the side street, not directly toward the car, down around toward the end of the block and come [sic] back down the alley and as he was approaching the car he saw a police officer had his brother in custody. So he turned and ran north about two blocks and then turned and went west about three blocks before a prowl car came along and they stopped and talked to him and asked him where he was going. He said he was going home and he turned and walked up onto a porch. He stood on the porch and he said the prowl car sat out there in the street, didn't move, so he thought well, I might as well give up. So he went back and told them he was the man they were looking for."

Thus within an hour and 20 minutes after his surrender petitioner had made two oral confessions—both admitted into evidence without objection—identical in relevant details to the written confession made the following day which the Court finds coerced. In light of the circumstances surrounding petitioner's arrest and confession, I believe the Court's reversal to be an abrupt departure from the rule laid down in the cases of this Court and an enlargement of the requirements heretofore visited upon state courts in confession cases. I therefore dissent.

The petitioner is neither youthful in age (though his exact age is not shown by the record) nor lacking in experience in law breaking. He is married and was a skilled sheet-metal worker temporarily unemployed. Some indication of his approximate age is given by the facts that his wife had been employed for some 14 years by the same employer, and that 11 years prior to the trial he had his first brush with the law, i. e., drunken driving, resisting arrest and being without a driver's license. Further, in 1949 he was convicted of breaking and entering, and in 1950 of robbery. During the same year he pleaded guilty to breaking jail and to "taking a car." He had not only served time but had been on parole for two years, making regular visits to parole officers to whom he was assigned. He cannot, therefore, be placed in the category of those types of people with whom the Court's cases in this area have ordinarily dealt, such as the mentally subnormal accused, *Fikes* v. *Alabama,* 352 U. S. 191 (1957); *Payne* v. *Arkansas,* 356 U. S. 560 (1958), and *Reck* v. *Pate,* 367 U. S. 433 (1961); the youthful offender, such as *Haley* v. *Ohio,* 332 U. S. 596 (1948), and *Gallegos* v. *Colorado,* 370 U. S. 49 (1962); or the naive and impressionable defendant, such as *Lynumn* v. *Illinois,* 372 U. S. 528 (1963). On the contrary, he is a mature adult who appears, from his testimony at the trial, to be of at least average intelligence and who is neither a stranger to police techniques and custodial procedures nor unaware of his rights on arrest. Thus the Court's reliance on *Lynumn* v. *Illinois, supra,*[1] is completely misplaced.

---

[1] In *Lynumn* v. *Illinois,* 372 U. S. 528 (1963), the petitioner was a woman who "had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." *Id.,* at 534. She confessed after the police told her that if she did not cooperate she would be imprisoned for 10 years, her children would be taken away and she would be deprived of state aid for them.

I do not say that only the young, the weak and the mentally disturbed are susceptible to coercion, but only that these factors have ordinarily been involved in coerced confession cases and have been consistently regarded by the Court as important circumstances in the determination as to whether a confession was voluntarily made. Along with circumstances related to the petitioner, of course, the determination of coercion requires examination of the conduct of the police and the environment in which interrogation and confession occurred. We have long recognized that coercion need not be based upon the physical torture involved in *Brown* v. *Mississippi*, 297 U. S. 278 (1936). But here there is no contention by the petitioner either of physical abuse or of the more sophisticated techniques associated with police coercive practices. There was no extended or repeated interrogation,[2] no deprivation of sleep or food,[3] no use of psychiatric techniques.[4] Further, there were no external circumstances such as threat of mob violence [5] furnishing an atmosphere tending to subvert petitioner's rationality and free will.

I cannot condone the conduct of the police in holding the petitioner incommunicado, but of course we have no supervisory power over state courts. The question under the Fourteenth Amendment is whether the will of the accused is so overborne at the time of the confession that his statement is not "the product of a rational intellect and a free will," *Reck* v. *Pate, supra,* at 440; and its determination "is one on which we must make an inde-

---

[2] See *Spano* v. *New York,* 360 U. S. 315 (1959); *Ward* v. *Texas,* 316 U. S. 547 (1942); *Chambers* v. *Florida,* 309 U. S. 227 (1940).

[3] See *Reck* v. *Pate,* 367 U. S. 433 (1961); *Payne* v. *Arkansas,* 356 U. S. 560 (1958).

[4] See *Leyra* v. *Denno,* 347 U. S. 556 (1954); cf. *Malinski* v. *New York,* 324 U. S. 401 (1945).

[5] See *Payne* v. *Arkansas,* note 3, *supra; Chambers* v. *Florida,* note 2, *supra.*

pendent determination on the undisputed facts." *Malinski* v. *New York,* 324 U. S. 401, 404 (1945), citing *Lisenba* v. *California,* 314 U. S. 219 (1941), and *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944). We have held that the fact that one has been denied consultation with an attorney, *Cicenia* v. *Lagay,* 357 U. S. 504 (1958), *Crooker* v. *California,* 357 U. S. 433 (1958), was not in itself controlling in such cases. Further, not even the fact that one is "held incommunicado, is subjected to questioning by officers for long periods, and deprived of the advice of counsel," without a showing that he had "so lost his freedom of action" that the confession was not his own, requires a reversal under the Fourteenth Amendment. *Lisenba* v. *California, supra,* at 240–241. Finally, the fact that police officers violated state statutes in their treatment of the petitioner does "not furnish an answer" to the question whether a confession was voluntarily made. *Id.,* at 235; see *Gallegos* v. *Nebraska,* 342 U. S. 55 (1951).

The Court's reversal here must be based upon the fact that, on the day after petitioner's arrest, when he signed the written confession at issue, he was told that after he made a statement and was booked he could call his wife. As to his testimony relating to the evening of his arrest, it is certainly disputed. Petitioner testified that he asked Detective Pike if he could call his wife, but Detective Pike testified that he did not even talk to petitioner. Lieutenant Wakeley testified unequivocally that petitioner made no such requests to him during their conversation, though he could not recall whether such requests were made "at any time that night." [6]

---

[6] Lieutenant Wakeley testified as follows:

"Q. Did Raymond Haynes at any time during that conversation [when he was interrogated] ask permission to make a telephone call to his wife? A. Not during the conversation.

"Q. Well, at any time that night? A. He might have asked afterward, after I got through talking to him. He wanted to know if his

The Court concludes, then, that the police, by holding petitioner incommunicado and telling him that he could call his wife after he made a statement and was booked, wrung from him a confession he would not otherwise have made, a confession which was not the product of a free will. In *Crooker v. California, supra,* at 436, however, we found no coercion or inducement, despite the fact that the petitioner's repeated requests for an attorney were denied and he "was told that 'after [the] investigation was concluded he could call an attorney.' "

In light of petitioner's age, intelligence and experience with the police, in light of the comparative absence of any coercive circumstances, and in light of the fact that petitioner never, from the time of his arrest, evidenced a will to deny his guilt, I must conclude that his written confession was not involuntary. I find no support in any of the 33 cases decided on the question by this Court for a contrary conclusion. Therefore, I would affirm the judgment before us.

---

wife would be notified. I told him we would notify her that he was being held.

"Q. Did he ask permission to make a phone call himself to his wife? A. He may have. I don't remember exactly whether he asked or whether we wouldn't notify his wife.

"Q. Did he say anything to you, Lieutenant Wakeley, if you remember in substance that he wanted to call his wife so that she could get a lawyer? A. No, I don't remember that."