STATE of Missouri, Respondent,

v.

Eddie B. JOYNER, Appellant.

No. 50326.

Supreme Court of Missouri,

En Banc.

Oct. 12, 1964.

Thomas F. Eagleton, Atty. Gen., Thomas E. Eichhorst, Asst. Atty. Gen., Jefferson City, for respondent.

Eugene E. Reeves, Caruthersville, for appellant.

COIL, Commissioner.

Eddie B. Joyner was convicted of rape by carnally and unlawfully knowing a female child under the age of sixteen and sentenced to thirty-five years in an institution to be designated by the Department of Corrections. Section 559.260, RSMo 1959 and V.A.M.S. He has appealed and contends that the trial court erred in admitting in evidence an oral confession allegedly made by him for the stated reasons that the confession was not voluntary but was obtained "as a result of mental and physical coercion" in violation of the due process clause of the Fourteenth Amendment.

Inasmuch as there is no contention that the state failed to make a submissible case independent of defendant's alleged oral confession, a general statement of the evidence, other than that relating to the confession, will suffice.

Prosecutrix, a white girl, fifteen at the time of trial, had known defendant for two years, arranged to meet him (as she had done on several prior occasions when she had had intercourse with him) on the night of October 11, 1962. There was an argument, defendant beat her, threatened to kill her, and then had sexual intercourse with her.

At the request of defendant's counsel, the court conducted a hearing out of the presence of the jury to determine whether the alleged oral confession was as a matter of law involuntary. Apparently only two of the officers who arrested and questioned defendant were interrogated at that hearing. Those same officers, the defendant, and a third officer testified (in rebuttal) in the presence of the jury. We shall examine all the evidence relating to the confession which was before the trial court, both in and out of the jury's presence, and consider the "totality of the circumstances" in determining whether that evidence conclusively shows the alleged confession was involuntary. If the evidence so shows, it is the duty of this court to hold that it was inadmissible as a matter of law. State v. Statler, Mo., 331 S.W.2d 526, 530 [7–9].

Richard Pankey, a deputy sheriff of Pemiscot County, testified that as a result of a complaint filed by the father of prosecutrix he arranged to meet two members of the Missouri Highway Patrol, Roy Jones and Bill Kiefer, about eleven o'clock on the night of October 15, 1962, and with them drove to defendant's house. Pankey went to the front door, the patrolmen remained outside. Upon identifying himself, Pankey was invited in, found defendant in bed and told him that he was under arrest, asked him to put on his clothes and go with him to the sheriff's office. Pankey also asked whether defendant had a gun; he said he did, took it from someplace in the bed, and gave it to the deputy. Pankey and the witness occupied the rear seat in an automobile and the two patrolmen were in the front seat. No conversation concerning the offense for which he was arrested was had on the way to the jail. They arrived at the sheriff's office around midnight and defendant was taken to the "identification" room (where there was a camera for making police photographs) which was about 8 x 10 feet. Defendant sat on a stool in front of the camera. All three of the officers were armed at the time of the arrest and at the interrogation and the pistols of the patrolmen and perhaps of the deputy sheriff were visible during the questioning. All three officers participated in questioning defendant and all three were at times two or three feet from him and could have touched him. The deputy sheriff testified further that the questioning consumed 20 or 30 minutes; that there were no threats or promises made to defendant; that no violence of any kind occurred; that defendant was not mistreated in any way; that no promises of leniency were made to defendant; that neither he nor either of the patrolmen said they would take defendant out and run him down the

street with a shotgun; that the statements defendant made were voluntary and of his own free will.

Pankey testified that after introducing himself and the troopers, he informed defendant of the charge for which he had been arrested and told him that they were investigating the complaint made by prosecutrix to the effect that he had had sexual intercourse with her and that he tried to explain "statutory rape" to defendant; that he then asked defendant if he had done the things the prosecutrix had accused him of and defendant said that he had; that defendant said he had beaten prosecutrix with a hose, had held a gun against her, and after that had had sexual intercourse with her; that the gun he had turned over to the deputy at the house was the same gun he had held against the girl; that he had had sexual intercourse with prosecutrix at times during the period from April or May 1961 until the time of his arrest except for the time when prosecutrix and her family lived in Florida; that he and prosecutrix had prearranged signals as to when and where to meet; that neither the deputy nor the patrolmen explained that defendant had the right to counsel or that he had a right not to make any statement; that no written statement was taken and no notes of the conversation were made; that defendant seemed nervous when they first began talking with him but he was not hysterical or frightened and spoke rationally; and that no one touched defendant to the witness's knowledge.

Trooper Roy Jones testified that he was present during most of the questioning; that all three of the officers were at times standing or sitting close enough to have touched defendant but that none of them put their hands on him; that the interrogation consumed fifteen or twenty minutes; that no notes were taken or record made; that defendant did not appear fearful but appeared nervous and was evasive; that no one spoke of a shotgun and no threats were made against defendant and no prom-

ises made to him. Jones testified further that the next day, October 16, he took defendant from the county jail to the prosecuting attorney's office where Jones and the assistant prosecuting attorney were present. Defendant was there asked whether anyone had mistreated him the night before or at any other time and defendant replied that he had been treated fairly. Jones said that the assistant prosecuting attorney advised defendant that anything he might say might be used against him and that the statements defendant made at the further interrogation on the 16th were voluntary and made of his own free will and accord. Defendant said on the 16th that he was familiar with the charge made against him, realized he was in trouble and was going to try to cooperate in every way "to get the matter straightened out." Defendant stated that he had met the prosecutrix on the night in question by prearrangement; that he had accused her of seeing another boy which she denied; that he hit her six times with a green garden hose, then took a pistol and said, "I should kill you," that she pleaded with him to let her go and after they had sexual intercourse she left; that he and prosecutrix had been having sexual intercourse at times since April or May 1961 and defendant went into the detailed circumstances under which he had met prosecutrix the first time he had sexual intercourse with her.

Defendant, a Negro, 42 years of age at trial time, testified that he had been born in Mississippi and had lived there until 1945 when he came to Pemiscot County, Missouri, where he stayed until 1955; that in 1955 he went to Michigan for a short period but returned the same year and had lived in Pemiscot County ever since; that he had always done farm work or work connected with "scrap iron"; that he had been married 23 years; that he had had no education; that he had been raised on a farm as one of twelve children. He testified further that he had known prosecutrix about two years; that their houses were next to each other at Cooter, Missouri;

that he had seen her on several occasions when she lived next door but that he had never had occasion to pick her up for anybody or take her any place and had never had sexual intercourse with her; that he knew the prosecutrix's parents; that he knew that she had worked in crews which he would pick up for the purpose of picking cotton.

Defendant testified further that his arrest occurred essentially as described by the deputy sheriff, except that defendant said that at the time of his arrest and during the trip to and apparently including the time of the interrogation was "about the scarest time I ever had in my life * * *"; and except also that he testified that the deputy sheriff indicated that they were arresting him because someone had stolen a station wagon on Black Island. Defendant testified that he had never before been charged with or convicted of any crime; that when he got to the little room at the jail the deputy sheriff was on his left and one of the troopers was sitting in front and one on the other side; and they started asking him questions about the stolen station wagon and then they asked if there was something else he had been doing for a long time and had become too careless with, and he said one of the patrolmen told him to stand up and he "reached me and caught me on this side of the face and drew his hand back, and asked me if I wanted him to slap my face in, and I said 'No, sir.' I almost liked to went out." Then the trooper asked him to name the white people he knew and when he came to prosecutrix's name the officer stopped him and kept continuously asking whether he didn't whip prosecutrix or have intercourse with her and he told them " 'No,' and that was the time he caught me on the face and I said, 'Yes.' " He didn't say anything about anyone hitting him to the assistant prosecuting attorney the next day "but one of the same ones, the same men that whipped me and I was afraid to." He testified that he was afraid and what scared him so much was

that after the officer's hand was on his face, they said "We will get those sawed off shotguns and put him out the door and start him running." He identified the man who said that and the one who "caught me on the face" as Trooper Kiefer. Defendant explained what he meant by having been caught on the side of the face: that the trooper "caught me on the side of the face, like this and—Q. What do you mean, caught you on the side of the face? A. With his hand. Q. He slapped you? A. No, sir. Q. Pushed you? A. No, sir. He asked me did I want him to smash my face in, and I told him, 'No, sir' and one of them spoke up and * * *."

The state called the third officer, Patrolman Kiefer, in rebuttal, who testified that he was present in the identification room when defendant was questioned and that he had heard the defendant's testimony on the stand; that he, the officer, had made no threats toward defendant whatsoever. "Q. Did you touch him in anyway? A. Yes, sir. I was questioning him and he was to the point where he was admitting— Q. What? A. He was to the point where he was admitting having intercourse with the * * * girl, and he turned his head down to his side like this, and this was merely a touch, and I touched his jaw to turn him around to look me in the eye when I was talking to him, and just a touch. Q. Did you say anything to him when you did that? A. I asked him to look me in the face—to look me in the eye and he turned his head to the side. Q. Did you touch him any more other than that? A. No, sir. That was the extent of it. Q. Will you come over here and touch me and touch me the way you did him? A. Yes, sir. * * * Q. Touch me and show me. A. I reached around and turned his head around like that. Q. Now, on your oath did you do it any harder than that? A. No, sir. Q. Was anything said about a shotgun or shotguns or turning him outside, and something about a shotgun? A. To my knowledge I never heard that mentioned all night."

In support of his contention that the trial court erred in admitting the oral confession in evidence, defendant argues that it was made on the night of the arrest "in an atmosphere of substantial coercion." He cites only the case of Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, and an annotation on the subject of the admissibility of pretrial confessions in criminal cases in 4 L.Ed.2d, p. 1833. As we read defendant's brief and as we understood the oral argument, the Haynes case and the cases cited in the annotation, supra, are to support the general propositions that the question whether an alleged "confession" is freely and voluntarily made is to be determined by an examination of the circumstances under which it is given and "the true test of admissibility * * * is whether or not the confession is made freely, voluntarily and without compulsion or inducement of any sort."

We agree that the Haynes case, supra, reiterates the proposition that the question whether an alleged confession is voluntary is to be determined by an examination of all the circumstances under which it was given. We point out, however, that the Haynes case recognizes that evidentiary conflicts relating to the facts on which defendant's claim of coercion is based are resolved by the triers of fact, i. e., by the state's adjudication. Haynes v. State of Washington, supra, 373 U.S. 504, 514, [6–10], 515 [12–15], 83 S.Ct. 1336, 10 L.Ed. 2d 513; Thomas v. Arizona, 356 U.S. 390, 402, 403.

██ The rule in Missouri, while recognizing that the state has the burden to prove the voluntariness of a confession which is made to police officers while a defendant is in custody, is that if there is substantial evidence tending to prove that a confession is voluntary the issue of voluntariness is for the jury. State v. Statler, supra; State v. Williams, Mo., 369 S.W.2d 408, 419[7]; State v. Bridges, Mo., 349 S.W.2d 214, 219[4].

Defendant's position with respect to his contention that the confession in this case was, as a matter of law, not voluntarily given may best be demonstrated by this paragraph from his brief: "It is submitted that the uniforms, weapons, instruments of crime detection present in the examining room, extremely small size and crowded conditions of the room, the proximity of the three policemen to defendant, defendant's race, his lack of education, his background, the time when the events occurred, his lack of experience with criminal charges, are all circumstances which lead one to look carefully at the question of whether or not defendant in this case freely gave the oral confession on the night of his arrest."

In addition, defendant relies upon the undisputed testimony that one of the officers did touch him which he contends constituted a battery.

We have heretofore related in rather minute detail the testimony relating to the confession. We point out that according to the testimony of all three officers, defendant, while nervous, did not appear to be hysterical or frightened; that the questioning consumed only 20 or 30 minutes; that there were no threats made and that no violence of any kind occurred; that no promises were made to defendant; and that defendant was not mistreated in any way. It is true, as defendant contends, that Patrolman Kiefer took the stand in rebuttal and, even though the other two officers had testified in effect that no one had placed a hand upon defendant, Officer Kiefer admitted that he did touch defendant's jaw to cause defendant to turn his head so that he would be looking at the questioning officer. The record shows that the manner in which that was done and the degree and extent of the touching were demonstrated to the court and jury. We cannot tell from this record what that demonstration showed, but a reasonable conclusion (based upon the testimony heretofore quoted) is that this touching, which did not occur, accord-

ing to the officer, until defendant was in the process of admitting that he had intercourse with the prosecutrix, did not necessarily and as a matter of law amount to physical coercion leading to the confession. Defendant stated what he meant by his testimony that the officer "caught me on this side of the face." He said he meant that the officer caught the side of his face with his hand, that the officer did not slap him or push him. Furthermore, defendant's testimony supports the conclusion that the thing which amounted to coercion, according to defendant, was not the touching of his face but the threat or question which accompanied it: "* * * did I want him to smash my face in?" But, as noted, all three officers testified that no threats of any kind were made.

The suggestions in defendant's brief that the deputy sheriff showed a remarkable memory for details of oral statements taken six months previously when no notes of any kind had been made, the fact that Officer Kiefer did not take the stand except in rebuttal and testified, as to the touching, contrary to the testimony of the other officers, as well as the uniforms and visible weapons of the officers, the age, race, education and background of the defendant, were all facts and circumstances for the consideration of the jury in resolving the question whether the confession was made freely and voluntarily. The court submitted the issue by an instruction about which there is no present complaint.

■ Inasmuch as there was substantial evidence that defendant's oral confession was freely and voluntarily given, we properly may not say, as a matter of law, upon a consideration of the "totality of the circumstances," that the alleged confession was involuntary or was obtained "as a result of mental and physical coercion."

It follows that the trial court did not err in admitting in evidence defendant's alleged oral confession. State v. Statler, supra; State v. Bridges, supra; State v. Williams, supra.

We have examined those record matters which we are required to review and find no prejudicial error in connection with them.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.