Argued and submitted May 13, affirmed as modified August 24, 1981

## STATE OF OREGON,
*Respondent,*

*v.*

## TIMOTHY JAMES MERRIFIELD,
*Appellant.*

(No. C 79-12-34527, CA 18630)

632 P2d 1286

George A. Van Hoomissen, Judge.

David E. Groom, Deputy Public Defender, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Defendant appeals his conviction for murder. He assigns as error (1) the denial of his motion to suppress his confession, (2) the admission of evidence of certain prior "bad acts" by defendant and (3) the imposition of a minimum 25-year sentence. We modify the sentence to eliminate the 25-year minimum provision, but otherwise affirm.

### 1. Confession

We take our statement of facts from defendant's brief. Defendant was convicted of killing a man named Forrest Taylor. Taylor had received an inheritance on September 26, 1979—his eighteenth birthday; he disappeared on October 18, 1979. Several days later, his car was found parked on an east Portland street. His body was subsequently found in a secluded area on November 19, 1979.

Defendant had first been interviewed by the police on October 13, 1979, while they were still searching for Taylor. After Taylor's body was found, they asked defendant to take a polygraph test concerning Taylor's death. Defendant agreed to do so.

The test was performed on December 13, 1979, by Detective Maunu. Before taking the test, defendant—who was not under arrest and was free to leave—signed a form indicating that he understood his constitutional rights. The test then began. Defendant answered a series of questions, but then asked that the test stop. He told Maunu he would complete it another day. Maunu felt that the defendant was being deceptive during the test when he denied knowing about the events surrounding Taylor's death.

After the test, defendant went to an interview room to talk to two other detectives. He was not readvised of his rights. He was still not under arrest and remained free to leave. The officers discussed the fact that he had not "passed" the polygraph test. Defendant then raised the question of an attorney, stating he was not sure whether he wanted an attorney or not. The officers told him that if he was not responsible for or involved in the murder he did not need an attorney. The officers also told defendant that, if he wished it, they could have a "confidential discussion."

Both detectives believed defendant knew something about the killing, and they wanted defendant to talk to them about it.

Defendant related to the officers that the victim and two other people came to his residence. They asked him if he would like to go out with them and use some cocaine and marijuana. Defendant went with them. They wound up in a remote East County area. Defendant went into the woods to urinate. While he was gone, he heard a shot and observed the other two men putting the victim's body in the car. They told defendant to get in the car. After traveling a short distance, they stopped and the other two men unloaded the body. Defendant fell asleep in the car and eventually woke up by himself. He drove the car to a spot near his residence and parked it for a couple of days. Finally, he moved it to the intersection where it was subsequently discovered by police.

After giving this statement, defendant indicated he would take the officers to show them the various locations where these events occurred on Sunday, December 16. Defendant was then taken home. On December 16, the officers went to the place where they were scheduled to meet defendant. He was not there because he had received a call from work and had been asked to report. Before officers could locate defendant, they received information from another detective that a man named Curtis Pugh had implicated himself and defendant in the murder of Forrest Taylor. When the officers located defendant, he was taken into custody and arrested.

Defendant was taken to the police station and given his *Miranda* rights. The officers read defendant a statement from Curtis Pugh and defendant responded that everything in the statement was accurate with the exception that Curtis Pugh, not defendant, had shot Taylor.

Eventually, defendant changed his story and stated that he, not Pugh, had been the one who shot Taylor. Defendant's statement was tape recorded that afternoon. After the taping was completed, the officers brought defendant and Curtis Pugh into the same room. There, they talked over some of the differences in the two men's stories

in an attempt to resolve conflicts between them. During this session, defendant and Pugh agreed that the motive for the crime had been robbery, with the victim being killed so that he would not be able to identify them.

At the end of the tape recorded conversation, one officer reminded defendant that defendant had been willing to make his statement without a lawyer being present. Defendant acknowledged that he had waived his right to a lawyer.

Doctor Richard Lazere examined defendant on February 21 and 23, 1980, for the purpose of administering psychological tests. Defendant's overall IQ was 88, which placed him in the "borderline range of intelligence." On a different test, defendant's IQ was 64, placing him at a mental age of ten years and four months. Lazere found that defendant had a particularly poor fund of information about his environment, poor vocabulary skills and very poor practical judgment or common sense. According to Lazere, an offer of a "confidential discussion" would be beyond defendant's vocabulary range. In Lazere's opinion, if the offer was made in the setting of a police station, defendant would be confused and would not know what was meant. Being examined by two policemen in a police station would, Lazere felt, be overwhelming, because defendant is very passive and ineffectual. Given defendant's background and the facts of this case, Lazere said that defendant might be so intimidated and confused that he would agree to anything he felt would get him out of the immediate situation.

Doctor Peter DeCourcy, testifying for the state, examined defendant with a battery of psychological tests. During DeCourcy's interview with defendant, he asked defendant if the police had been nice to him, and defendant said "They were very nice. And they asked me to come in before the polygraph, after the polygraph they weren't so nice." DeCourcy found that defendant had ample intelligence to appreciate the situation in which he found himself. However, DeCourcy also said that if police were threatening, hostile, or if they lied to defendant, that would have an effect on his interview with them.

The trial court found that defendant's December 13, 1979, statement was admissible because he was not in custody and had no reason to believe he was. The court further found that the December 16, 1979, confession was obtained from defendant after he had knowingly and intelligently waived his right to remain silent and his right to counsel.

The facts underlying the trial court's legal conclusions were recited by the court on the record. They all have ample evidentiary support and will not be re-examined here. *See Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. Warner,* 284 Or 147, 585 P2d 681 (1978). Defendant argues, however, that—accepting the facts—the court's *legal conclusions* are wrong. He asserts that the officer's suggestion that defendant did not need an attorney if he had not participated in the murder was impermissibly coercive in that it would make any request for an attorney "tantamount to admitting guilt." Defendant further argues that this first statement, if impermissibly obtained, would "taint" his later confession. *See State v. Mendacino,* 288 Or 231, 603 P2d 1376 (1979).

■ It is clear from the concatenation of facts in this case that defendant was not in custody on December 13. Defendant is correct in suggesting that, inasmuch as he was not in custody on that date, his statements on that day are inadmissible only if coerced. *See Haynes v. Washington,* 373 US 503, 83 S Ct 1336, 10 L Ed 2d 513 (1963).

■ Turning to the question of coercion, it is difficult to say more than that the facts establish that, whatever personal considerations may have impelled defendant to tell the story he told, there was no constitutionally impermissible coercion present here. Dr. DeCourcy's testimony—which the trial judge accepted—showed defendant is not like the child-like defendant in *State v. McGrew,* 38 Or App 493, 590 P2d 755 (1979). Neither are we confronted with a course of coercive tactics like those found in *State v. Foster,* 288 Or 649, 607 P2d 173 (1980). We find no error in the trial court's conclusion that defendant's December 13 statement and his subsequent confession were knowingly and voluntarily made or otherwise permissibly obtained.

## 2. Prior "Bad Acts"

■     At the trial, the following exchange occurred between the prosecutor and Timothy Mackley, an acquaintance of the defendant and a witness for the prosecution:

"Q.. [PROSECUTOR] Mr. Mackley, do you remember talking to my investigator and myself about an incident when a friend of yours stopped you and the three of you, the Defendant and Curtis Pugh got out of the car?

"A.   [THE WITNESS] Yes, I do.

"Q.   Do you want to tell us about that?

"A.   Well, I was driving from Powell up 119th towards Division, towards my apartment, was coming up the street and a boy named Terry Schaeffer, about 18 years old, flicked a piece of plastic at my car, which he didn't know, you know, who I was. I stopped my car and turned around and came back. I got out of the car and Curtis Pugh and [the defendant] came out, which they probably, I guess, had the gun in the car. I wasn't sure at the time. I hadn't been—I can't remember. They came out and told Terry Schaeffer, you know, just jokingly or I don't know, just you know, don't do that or we'll blow your stuff away, something like that.

"Q.   Who had the gun?

"A.   I'm not sure.

"Q.   Was the gun displayed?"

At this point, defense counsel objected to the testimonial reference to "blowing away" someone, arguing that such evidence was impermissible because it portrayed defendant as a bad man performing a bad act (menacing) unrelated to the crime with which he was charged. Counsel also sought a mistrial on the same ground. The objection was overruled; the mistrial was denied.

Defendant concedes on appeal that the state was entitled to show defendant's possession of the gun. His sole objection is to the portrayal of the allegedly menacing way in which it was being displayed. He says, "It portrays defendant as violence-oriented, perhaps even gun-happy." We do not read the testimony that way. The "threat" was made "jokingly," according to the witness. Horseplay and high spirits are not the sort of "other crimes" or "bad acts" evidence condemned in such cases as *State v. Manrique,* 271 Or 201, 531 P2d 239 (1975). The trial judge did not

abuse his discretion in denying a mistrial or in otherwise overruling defendant's objection to this testimony.

### 3. Minimum sentence

■ Finally, defendant challenges the provision in his sentence that "* * * he shall be required to serve not less than 25 years [of his life sentence] before he becomes eligible for parole * * *." Defendant is correct. Such a sentence, entered pursuant to ORS 163.115(5), is impermissible under *State v. Shumway,* 291 Or 153, 630 P2d 796 (June 23, 1981). The provision is deleted. *See State v. Charmley,* 53 Or App 225, 637 P2d 795 (1981). In all other respects, defendant's conviction is affirmed.

Affirmed as modified.