THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID RHOADS, Defendant-Appellant.

First District (5th Division) No. 77-1734

Opinion filed June 8, 1979.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and arson (Ill. Rev. Stat. 1975, ch. 38, par. 20—1(a)) and was sentenced to a term of 60 to 100 years on the murder conviction. On appeal, defendant presents several arguments, but because of our disposition we only will consider: (1) whether the trial court erred in admitting defendant's custodial statements into evidence; (2) whether the trial court abused its discretion in refusing to admit certain photographs into evidence; (3) whether the trial court erred in refusing to allow psychiatric testimony on the contents of certain medical records; and (4) whether the trial court erred when it refused to give special verdict forms of not guilty by reason of insanity as to each offense charged. We reverse and remand.

At approximately 5 p.m. on July 17, 1976, Vickie Rhoads suffered extensive burns in a fire at her parents' home in Palatine, Illinois. She died from the burns on the following day. Her husband, David Rhoads, was charged with murder and arson. The relevant testimony at a suppression hearing and the trial follows:

## I. Hearing to Suppress Defendant's Pretrial Statements

Defendant was taken to the police station immediately after the fire and within a 28-hour period gave a number of oral and two written statements. Several Palatine police officers and an assistant State's Attorney testified concerning the circumstances surrounding the making of the statements. Officer Dale Ott stated that he had first seen defendant in the back seat of a police car in the vicinity of the fire; he said that defendant was not wearing handcuffs at the time. At about 5:30 or 6 p.m., he again saw defendant in an air-conditioned interview room at the police station and had a conversation with him. At the time, Officer Jack Byrnes was also present.

Ott stated that after he had introduced himself to defendant, defendant asked him how Vickie was doing. Ott told defendant that he did not know. He said that defendant appeared calm and he noticed that he was dirty. Eventually, Ott advised defendant of his rights and asked him if he understood them. Defendant said that he did, but that he wished to give a statement concerning the fire and the events preceding the fire. Ott stated that defendant did not ask to see an attorney and did not complain of any pain. He also stated that he did ask defendant how many beers he had drunk, but that he did not ask defendant if he was under the influence of drugs.

After the oral conversation, which lasted about 30 minutes, defendant agreed to give a written statement to Ott. He signed a voluntary waiver of his rights and then he proceeded to write out his statement. The statement took 50 minutes to write, despite being approximately 10 lines long, and it was very poorly written. Ott stated that he did not threaten defendant while he was writing out his statement. He stated that during this initial interviewing period, he had seen defendant with a cup and he thus assumed that he had been given coffee.

Ott had a second interview with defendant later in the evening; Officer Byrnes was again present at this interview. Ott advised defendant of his *Miranda* rights and defendant again said that he understood them, but that he wished to give a statement. Ott said that defendant did not ask to see a lawyer or complain that he needed medical treatment for any burns. Also, he noted that although defendant had wrapped a blanket around himself, he did not see him shaking. After defendant had given his statement, he was placed in a cell and remained there overnight.

Ott said that at around 10:45 a.m. on July 18, defendant was taken to a hospital by Officers Langguth and Daut. There, he received treatment for burns on his left hand and shins. Afterwards, he was brought back to the police station and, at about 1 p.m., Ott once again spoke with him. Ott told defendant that his wife had just died. He appeared shaken and began pounding his hands on a table and his head on his hands.

At 1:30 p.m., Ott spoke to defendant in the lockup with Officer Ralph Winkelhake and Sergeant Mark Kjellstrom present. Ott once again read him his rights and defendant said that he understood them but that he wanted to give a statement. During this statement, he did not complain of pain. At around 2:15, he had completed his statement. Later in the afternoon, he was granted a request to make a telephone call to his employer.

At 6 p.m., Assistant State's Attorney Griffith spoke to defendant with Ott present. Griffith advised defendant of his rights and he indicated that he understood them. At 7 p.m., a court reporter arrived to take a written statement. Griffith once again advised defendant of his rights. After defendant's statement had been typed up, both he and Ott read and signed the statement. Additionally, defendant signed his initials to every page of the statement. Ott stated that defendant did not complain about pain during the statement. He also stated that defendant had received three meals on the 18th.

On July 19, Ott told defendant that he had discovered some discrepancies in his story and, for the first time, defendant stated that he wished to see an attorney. On July 20, defendant received a bond hearing.

Officer John Byrnes testified that he was "in and out" of the interview room when defendant was giving his first written statement. While there,

defendant asked how his wife was doing. He did not hear defendant request any medical attention and, although he noticed that defendant's hands were dirty and his hair was singed, he did not notice any burns on him. Byrnes said that he did not ask defendant if he was under the influence of drugs or if he was educated. He stated that during the time he spent in the interview room, he never once saw Ott threaten defendant.

Sergeant Ralph Winkelhake and Officer Mark Kjellstrom testified that they interviewed defendant on July 17 at 7 p.m. in the interview room of the Palatine police station; Winkelhake came "in and out" during the interview. Kjellstrom advised defendant of his rights and defendant said that he understood them, but that he wished to talk. Both Kjellstrom and Winkelhake questioned defendant during the three-hour interview. Even though the weather was warm outside, defendant wore a blanket which the police had given to him when he had indicated that he was cold. Defendant indicated on a number of occasions that he had received some burns to the back of his hands and that he felt some "stinging" in his hands and his thighs. Kjellstrom looked at defendant's hands but, although he noticed that they were dirty, he did not see any injuries. Winkelhake noticed that defendant's hair was singed. Kjellstrom asked defendant if he needed medical attention, but defendant said that he did not. During the interview, neither of the policemen asked defendant if he was under the influence of drugs. Winkelhake said that he gave defendant some coffee and donuts, but that defendant did not eat any of the donuts.

Officer Dennis Langguth testified that in the morning hours of July 18, he took defendant to a hospital for treatment of his burns. He noticed blisters on defendant's fingers, but he never heard defendant complain of any pain associated with those blisters. He said that he saw defendant smile and wink at a nurse while she was treating his burns.

Assistant State's Attorney Griffith testified that he arrived at the police station at 6 p.m. on July 18, and advised defendant of his rights prior to taking his written statement. He said that he never asked defendant if he was under the influence of drugs, but he did ask him if he was under the influence of alcohol.

Defendant testified that he had graduated from grade school at the age of 15 and had attended high school for only five or six months. He said that he had been drinking beer and smoking marijuana most of the day on July 17. He had first begun drinking at 9 in the morning. He only had a bologna sandwich and a Pepsi for breakfast and by 3 p.m. he had consumed 12 cans of beer. At 3 p.m., he and his wife, Vickie, went to a park where he had two "hits" of L.S.D. and another six cans of beer. He and his wife also consumed about three-fourths of a bottle of Tequila Sunrise while at the park. After he left the park, he had maybe an additional three cans of beer. When asked if he had told Assistant State's

Attorney Griffith that he had only had four beers and had not been taking pills or smoking on July 17, he said that he had made this statement but that he was not lying to him "because he was still high." He said that he wanted to tell Griffith the truth. Defendant also said that he gave a statement to Griffith because he had made a statement earlier and he did not figure that he had anything to lose.

Shortly after the fire, he told the police that he wanted to go to the hospital with his wife, but they asked him first to come with them to the police station. When he arrived at the station, he was placed in an interrogation room and was asked to give a statement. He refused and said that he wanted to see a lawyer, a doctor, and his wife. He wanted to see a doctor because he felt pain in his hands and leg, he was chilled, and he was coughing up "some black stuff." Officer Ott then came in and asked him what had happened. Defendant again refused to talk and requested to see an attorney. Ott told him:

> "Well, you need help and if you talk to us we'll see that you get some help. * * * We think that you're sick."

Defendant then began talking and gave his written statement. As far as he knew, he was not under arrest at this time.

After defendant had given his statement, he was placed in a lockup. He complained that he was cold and that his hand hurt and requested to see a doctor. An officer brought him a blanket and told him that he would get someone to look at him later. He could not remember if he was given any coffee or food during the evening. He spent the evening being interrogated by one officer or another and was not able to sleep very well.

Defendant said that the effects of the L.S.D. finally wore off in the morning hours of July 18. He went to the hospital for treatment of his burns and while there, skin was removed from his hands and shin because they were blistered. He said that they had first started to blister about an hour after he had arrived at the police station on the previous day. At about 1 p.m., Officer Ott again asked him if he wanted to talk. When defendant again refused, Ott said, "Do you know you can get the electric chair for what you did." Ott then explained that Vickie had just died. After defendant had heard this, he broke into tears and began "banging" his hands against a table. Later in the day, defendant spoke with Assistant State's Attorney Griffith. He said that he spoke with Griffith because he wanted to tell him the truth and because he had made a statement earlier and did not figure that he had anything to lose. On July 19, defendant went to another hospital to be treated for the burns. While there, the treating physician asked him why the injuries were not taken care of previously. On about the 22d, defendant was admitted to Cermak Memorial Hospital because of psychiatric problems.

Doctor Vincent M. Greco testified that he was the emergency room

physician who treated defendant on July 18. He said that defendant had mostly first degree burns with some second degree burns on both of his hands. Three quarters of the top of defendant's left hand was burned. The burns were visible to the naked eye. Greco could not recall whether defendant made any complaints about the burns. His treatment included burn dressings and a tetanus shot. He indicated that in subsequent treatment of burns, the skin is sometimes removed.

Doctor Barry Mizock testified that he treated defendant for mostly second degree burns on July 19. He said that first degree burns often develop into second degree burns and that second degree burns usually blister within an hour. Mizock cleaned defendant's wounds and removed some of the blistered skin. He also prescribed some analgesic for moderately severe pain.

After hearing this testimony, the trial court denied the motion to suppress.

## II. The Trial
### A. State's Case-in-Chief

Carol Reiter, Vickie's mother, testified that she was the owner of a house at 306 Morris Street in Palatine. She said that when Vickie and defendant decided to get married, Vickie was 17 years old. In 1975, she had filed charges against defendant for contributing to the delinquency of a minor, but she withdrew the charges because she felt that it would do no good. Eventually, she learned to "tolerate" the marriage but she warned defendant that if he hurt Vickie, he would be accountable to her.

Reiter stated that on July 2, 1976, Vickie moved back home along with 80 percent of her personal possessions. From July 2 to July 15, Vickie spent all but two of her nights at the Reiter house. During that period of time, defendant paid a number of visits to the house. On July 15, Reiter and several members of her family left for a vacation to Canada. At the time, Vickie was still alive.

Reiter next saw Vickie in a hospital at about 4 a.m. on July 18. She said that Vickie could communicate by nodding her head. When she next saw Vickie at 1:05 p.m., Vickie was dead. On the 18th, Reiter had gone to view the damage caused by the fire at her house. She said that the kitchen had been destroyed and there was $12,400 worth of damage to the house. She said that she never gave anyone permission to start a fire at her house on July 17.

Several neighbors and fire department personnel testified to the events surrounding the fire at 306 Morris on July 17, 1976. Some of the neighbors said that they were attracted to the fire by the smoke, others said that they heard glass breaking. Richard Guthrie stated that defendant ran by his house and told him that his wife was on fire. Janet Bone said

that she was talking to Saunders Reinhard, a minister, when defendant came up to them and said, "[h]elp me, my wife is burning up." At the time, she noticed that defendant was wearing an unsoiled white tee shirt and she did not recall smelling any alcohol on him.

When each of the neighbors arrived, he or she tried various methods of putting out the fire and rescuing Vickie. James Marton testified that he entered the house and attempted to put out the fire with an extinguisher. After he failed, he went into the backyard and found a hose which he could use. While there, he saw defendant who was wearing a green and white shirt. Defendant muttered something about gasoline and an outboard motor in the garage. He further said that, "[i]t was my fault," and mentioned something about a lighted cigarette. Marton testified that defendant "seemed like he was out of it," and noted that defendant's hair, eyebrows, and hands were burned.

Other neighbors hosed down the house, broke windows, and attempted to "ram open" the garage door. Several of them heard screams coming from the house. Reinhard said that he saw defendant attempt to enter the house through the front door. He thought that defendant had been successful.

Gary Fergestad testified that he saw a man whom he believed to be defendant kicking in the glass on a door next to the kitchen. Defendant entered the house and then came back out again. Fergestad then went into the house and carried Vickie out of the kitchen. He later observed a blood stain on the shoulder on which he had rested Vickie's head.

Meanwhile, several men continued to "ram" the garage door. Eventually, somebody told them to stop and unlocked the door from the inside. Fergestad said that he thought that defendant had unlocked the garage door. After the door had been raised, somebody ran from the garage and Fergestad then came out with Vickie. While she was being carried out, David Bone heard her say "[i]t was an accident." Fergestad placed Vickie on the grass and somebody proceeded to extinguish the fire on her clothing. Most of her clothing had been burned away.

Terry Dineen testified that while Vickie was being ministered to on the front lawn, he went to the back of the house and attempted to enter the kitchen. After his attempt proved to be unsuccessful, he sat down on a picnic bench. Defendant, who was also sitting on the bench, asked him for a cigarette. Dineen noticed that defendant's hair was singed and asked defendant what had happened. Defendant told him that he had been fixing a motor. When Dineen again asked him what had happened, defendant said:

> "You know, I love her. We were just fooling around. It wasn't supposed to end this way. I love her."

After the flames on Vickie's clothing had been extinguished,

Fergestad noticed that Vickie was bound with a lamp cord. The cord was tied around her neck, down the center of her back to her hands, around her hands, down to her feet, and around her feet. A number of the neighbors characterized the binding as similar to being "hog-tied." They said that the cord was tied anywhere from fairly tightly to very tightly. Fergestad said that "it didn't appear that there was any way she could have gotten out of it." While Vickie was lying bound, David Bone asked Vickie who had done this to her. She told him "[l]ater, later," and also said, "[g]et my neck please." Several of the neighbors eventually cut her free. Richard Guthrie testified that he had difficulty cutting the cord around her neck because it was so tight. He also said that while she was being cut free, he overheard her tell a neighbor that "he" did this to me.

As the heat and smoke increased, Vickie was moved to a lawn across the street from the house. While she was lying there, Janet Bone came up to her and Vickie told her that she wanted to go to a hospital. Defendant then came by and said that "[i]t was an accident." Vickie said "later, later." At some point, Janet asked Vickie who had done this to her and Vickie, once again, said "later, later." Terry Naughton said that while Vickie was lying on the lawn across from the house, he heard defendant tell Vickie that he was sorry. Naughton said that one of his neighbors was present when defendant made this statement. Saunders Reinhard said that he overheard a woman talking to Vickie while she was lying on the lawn. He said that she continued to ask Vickie if her husband had done this to her until Vickie finally responded that he had not. Saunders' wife, Juanita, who also saw the woman who was talking to Vickie, testified that she never heard Vickie say that her husband did not do it.

Lieutenant William De Pue of the Palatine Fire Department testified that when he arrived at the Reiter house, the fire already had been extinguished. He went over to an ambulance to see if he could help the woman who was lying on the lawn. There, he met defendant. He noticed that defendant's hair was damaged and that his hands were blistered. Defendant told him that the woman who was on the lawn was his wife and that she had been burned after a gas can had exploded. He explained that he had been carrying the can through the house when his wife lit a cigarette and ignited the gas. When the explosion and fire occurred, he ran out of the house, but when he heard Vickie screaming, he returned to save her. While defendant was telling De Pue his story, he appeared to be visibly upset and weak. De Pue received permission from a police officer to put defendant in the back seat of a squad car.

De Pue left defendant and went into the Reiter house. He noticed that the fire had begun in the kitchen and had been caused by an accelerant; he saw a scorched gas can in the area. He left the kitchen and went back outside again to talk to defendant. This time, defendant told

him that it was just a game. He said that he had brought the gas can into the house, said something like "this is it," and then lit the match. De Pue said that after defendant had related this to him, defendant began to cry.

Lyle Raymond Bemis and Robert Wright each testified that they were firefighter paramedics for the Village of Palatine and that they were called to the Reiter house on July 17. Bemis estimated that over 80 percent of Vickie's body had been severely burned. He said that Vickie had told them that the burns were caused by gasoline. Wright searched the Reiter house and discovered a gas can without a cap just inside the kitchen. After the search, Bemis and Wright took Vickie to Evanston Hospital where she was treated for her burns.

Doctor James Kozlowski testified that he was called to the emergency room of the Evanston Hospital at about 6 p.m. to treat Vickie. He estimated that she had suffered third degree burns to 90 percent of her body. He also said that her scalp was bloody. When he asked her what had happened, she told him that her husband had tried to kill her. She explained that he had tied her to a chair, poured gasoline on her, and then set her on fire. Afterwards, he poured gasoline on the floor and attempted to burn down the house.

Patricia Halevy, a nurse, corroborated Dr. Kozlowski's recollection of Vickie's statement. She stated that Vickie was in shock but that she was in complete control of her faculties when she made her statement. She also said that when she saw Vickie she noticed that a cut pair of panty hose had been tied into her hair.

While Vickie was being treated at the hospital, defendant was being interviewed at the police station. Officer Dale Ott's testimony on defendant's condition and the circumstances surrounding the interviews and statements was substantially the same as his suppression hearing testimony. In addition, he said that in his first conversation with defendant, defendant told him that after he had three or four beers at Deer Grove Forest Preserve he went to the Reiter house with Vickie. Defendant said that he brought a gas can, which he had taken from a boat owned by the Reiters, into the house and set it down in the kitchen. Subsequently, he and Vickie decided to engage in "a game" in which he would act as a tough guy, tie her up, and then rape her. While playing this game, defendant lit a cigarette and threw the match down on the floor, thus accidentally igniting the gasoline.

After giving this oral statement, defendant agreed to give Ott a written statement. In his handwritten statement, defendant said that when he tossed the match, Vickie was sitting on the kitchen table and he was standing in front of her. After the gas can had ignited, he ran outside seeking help. When he returned, he broke down the garage door so that he could get Vickie out of the burning house. Afterwards, someone else

carried Vickie away and defendant went into the back yard and drenched himself with a hose. Defendant signed this statement at about 7 p.m.

After receiving defendant's written statement, Ott went to Evanston Hospital to take a statement from Vickie. He asked Vickie if she could understand him and she nodded that she could. Ott then asked her if: (1) her husband had tried to kill her; (2) her husband had tied her to a chair; and (3) her husband had poured gas over the lower portion of her body. She nodded, "yes," to each of these questions. When Ott asked her why her husband had done these things to her, she *said* that she did not know. On cross-examination, Ott admitted that he had testified at a preliminary hearing that he had asked Vickie if she had been first tied up and then placed in a chair and that she had nodded her head, "yes."

Ott returned to the police station after interviewing Vickie. At approximately 9 p.m., he once again interviewed defendant. Defendant told him that when he and Vickie were at Deer Grove Forest Preserve, they had an argument. When Ott asked defendant to elaborate on the argument, defendant first refused to elaborate and then said that there was no argument. Ott asked defendant several more questions, but defendant said that he could not remember anymore. Ott then placed defendant in a cell and took his shoes and levis from him. Ott said that the shoes and pants had a gas smell on them.

Ott next saw defendant at about 1 p.m. on the next day. He told defendant that Vickie had just died. About one hour later, Ott, Detective Kjellstrom, and Sergeant Winkelhake went to defendant's cell to interview him again. At this time, Ott noticed a bandage on defendant's left hand. Ott once again asked defendant what had happened on the previous day. Defendant told him that after he had brought the gas can into the house, he placed the can by the refrigerator, took out a can of beer, and went into the living room to watch television. Vickie read a book in the backyard. When she returned to the house, she asked him if he wanted to make love and he agreed. She then went into the bedroom and returned with a cord. She sat on the kitchen table and began wrapping the cord around her feet; he eventually came over and helped to tie her. After Vickie had been tied, she asked defendant for some rubbing alcohol. Defendant explained to Ott that they had previously rubbed alcohol on their bodies while making love and that they had gotten a "high" from it. Defendant said that he looked for alcohol in the cupboard, but that he could not find any. He then asked her if gasoline would be acceptable and Vickie said that she did not know but that she guessed that it would be acceptable. Defendant poured a puddle of gasoline onto the kitchen floor and lifted Vickie off the table and sat her down in the gasoline. Defendant then joined her in the gasoline. Eventually, Vickie told him to hurry because it was stinging. He moved closer to her, took out a cigarette, and

then lit the cigarette. When Vickie asked him, "What the hell are you doing," he said, "[o]h, shit" and threw the match down. The match ignited the gasoline and the place went up in flames. Defendant's clothes caught fire and he ran to the living room, pulled down a curtain, and used it to put out the flames on his clothing. He then went back into the kitchen and tried to get Vickie, but he was unable to reach her. He threw the drape to Vickie and ran outside for help. Ott testified that while searching the Reiter house, he found a bottle of rubbing alcohol in the bathroom.

Ott said that he was present at 7 p.m., when defendant gave a written statement to Assistant State's Attorney Griffith. Defendant's statement differed from his earlier statement in a number of respects. He told Griffith that he only stayed at Deer Grove Forest Preserve for 15 minutes and that he had only had three or four beers during the day. He also told Griffith that he did not drink anything else and did not take any pills. He said that Vickie had told him to take a lawn chair and "stuff" out of the front yard because some of the neighborhood children had been playing around the house. He "presumed" that she also meant to take the gasoline from her parents' boat which was located along the side of the house. Once he retrieved the items, he attempted to put them in the garage; however, the door was locked. He then carried the items into the kitchen and was on his way to the inside entrance to the garage when he stopped at the refrigerator for a beer. He then apparently forgot about the gas can and went into the living room to watch television. When Vickie returned to the house, she first went downstairs to get the rope and then asked defendant if he wanted to make love. Defendant said that when he could not find any rubbing alcohol, he asked her if she wanted him to go back to their apartment to get some. She told him that they did not have the time because they had a dinner engagement. Defendant said that when the house went up in flames, his pants caught on fire. He also said that when he returned to the house after going for help, he grabbed Vickie by the ankles and pulled her out until someone else came to help him.

Officer Mark Kjellstrom testified that on July 17, he was called to the Reiter house and he functioned as an evidence technician. He discovered an undamaged gas cap in the living room under a bar. He also found two women's wallets on the floor in the kitchen and found a green leafy substance which had the general consistency and appearance of marijuana in one of them.

Kjellstrom's testimony on defendant's condition and the circumstances surrounding the interviews and statements was substantially the same as his suppression hearing testimony. In addition, he said that he did not notice defendant shivering but he did notice that defendant's hands were slightly red. He interviewed defendant at 7 p.m. in a relatively small room in the basement of the police station. Kjellstrom questioned

defendant for three hours. Defendant's statement to him was similar to the one he had given Officer Ott earlier in the day. It differed in that defendant said that when he and Vickie had agreed to make love, she told him that it was his turn to tie her up. He said that he never put the cord around her neck and he never took the cap off the gas can.

When Kjellstrom interviewed defendant on July 18, defendant told him that he had spilled gasoline on the floor prior to the fire. Defendant also told him that his story of July 18 was different than his story of July 17 because he was afraid on the 17th. Kjellstrom believed that defendant told him that he had not planned to harm Vickie.

Officer Dennis Langguth's testimony at trial was the same as his testimony at the suppression hearing.

Cindy Jerard, a social friend of defendant, testified that she received a number of letters from defendant while he was either in jail or at Cermak Hospital. In one letter, dated August 3, 1976, he wrote that "[i]t looks like I really got myself into hot water this time." In another, dated August 27, 1976, he wrote:

> "Hi, Cindy. I'm not giving you no bull. I didn't mean to kill her and I'm not trying to get you involved. I was just trying to scare her when the damn thing went off."

In a third letter, dated December 12, 1976, he wrote:

> "I would like to tell you what really happened that day, but first you would have to promise me you wouldn't tell any body. It would be incriminating if the wrong people heard about it. That's no line of B.S., either."

Several stipulations were made during trial. It was stipulated that Vickie's clothes, defendant's shoes and pants, a tile taken from the kitchen floor, and a piece of wood from a kitchen cabinet all contained gasoline. It was also stipulated that the seat cushions from a kitchen chair did not contain gasoline.

## B. DEFENSE CASE

John Keefe, a public defender, testified that he remembered talking to Carol Reiter in 1974. At the time, she told him that she thought that defendant needed psychiatric help. She said that defendant had a history of psychiatric problems and had been in hospitals for treatment of his psychiatric problems. Keefe also testified that he saw defendant when he appeared for his bond hearing on July 19, 1976. He described defendant as being distressed and in a "trance or unresponsive state." He also said that there were soot or smoke marks on his face and shirt.

Officer John Bryant testified that at about 5:30 p.m. on July 17, he arrived at the Reiter house and met defendant. He noticed that defendant's hair was singed. When he asked defendant what had

happened, defendant told him that "[i]t was a game." Bryant then put him in the back seat of his squad car, but he did not place handcuffs on him. While he was driving defendant to the police station, defendant asked him how Vickie was doing and where they were taking her.

Defendant testified that he was a grade school graduate and had attended six or seven different grade schools. In 1968, he spent five weeks in the Army. While there, he attempted suicide by slashing his wrists and burning himself; he was placed in a psychiatric institute. Eventually, he was given an honorable discharge for medical reasons. In 1969, he attempted suicide by running his automobile into a telephone pole. In September of 1972, he was placed in Northwest Community Hospital after attempting suicide by slashing his wrists and drinking a bottle of acetone. While he was in the hospital, he twice attempted suicide by trying to hang himself and by trying to sever his good veins by biting through his wrists while he was in restraints. He entered another hospital in November and while there he was asked to sign various papers for admission to Manteno State. He refused to sign and was released from the hospital. In March 1973, he entered St. Theresa Hospital for use of barbiturates and L.S.D., which he had been using since 1967. Subsequently he was released from the hospital but he was readmitted later in the year. In August of 1973, a court entered an order committing him to Chicago Read mental hospital. During the four months which defendant spent at Chicago Read, he attempted suicide once again. Between November of 1973 and July 22, 1976, defendant did not receive any further psychiatric treatment. At the time of the July 17 incident, he was employed at a ranch for wards of the State and was considered a good worker.

Defendant said that Vickie had moved back to her parents' house because she thought that they had been taking each other for granted. While she was there, he visited her almost every night and spent some nights with her in the Reiter house. He said that he eventually received Carol Reiter's permission to stay at the house and on July 15, he helped carry Reiter's luggage to her car.

On July 17, defendant had a can of beer and a bologna sandwich for breakfast at the Reiter house. He denied ever telling Officer Kjellstrom that he had stopped at a restaurant for breakfast. Sometime before 3 p.m., defendant and Vickie took some L.S.D. At 3 p.m., they went to the Deer Grove Forest Preserve where defendant drank beer and Tequila Sunrise and smoked marijuana. Defendant testified that he drank three or four beers, but admitted that he had testified at the suppression hearing that he had drunk possibly more than a six-pack. He also testified that he had drunk maybe a third of a bottle of Tequila Sunrise at the forest preserve but admitted that he had testified at the suppression hearing that he had

from one-half to two-thirds of a bottle. While at the forest preserve, he had a slight argument with Vickie over a glass which had been knocked off a picnic table.

At 3:30 p.m., defendant and Vickie returned to the Reiter house. He turned on the television and began watching the lines and zigzags across the television set. After awhile, Vickie asked him to go outside and remove anything in the backyard which could be vandalized. Defendant went outside and found a lawn chair in the yard and a can of gasoline under a tarpaulin in a boat owned by the Reiters. He brought the items inside the house and as he was passing the refrigerator on his way to the garage, he stopped for a can of beer. He then forgot about the gasoline can, leaving it by the refrigerator, and went back into the living room to watch television. Defendant stated that during that day, he had drunk about 18 beers.

About an hour and a half later, Vickie came into the living room with an extension cord and asked defendant if he would tie her up and pretend to rape her. He said that this was not an unusual request because they liked to tie each other up and did so at least three or four times a month. He also said that they liked to put foodstuffs on each other and lick it off, make love in other people's yards, and show each other nude photographs of themselves while they were engaging in sex. After defendant agreed to tie Vickie up, she asked him to look for some rubbing alcohol while she tied her feet. He looked in the kitchen cabinets but he could not find any alcohol there. He said that he looked there because they kept rubbing alcohol in a kitchen cabinet in their apartment. Defendant asked Vickie if she wanted him to go to their apartment to get some alcohol, but she told him that they did not have the time because they had a dinner engagement. She then agreed to try the gasoline.

Defendant said that he tied the rope around Vickie's hands and around her neck. He tied the rope very loosely around her neck, tying it about 4 or 5 inches below her neckline. He could not remember telling Officer Kjellstrom that he had not tied the rope around Vickie's neck. Defendant said that he tied Vickie as he did because he was going to rape her from the rear. After Vickie had been completely tied, defendant picked her up and sat her in some gasoline which he had poured on the floor and then joined her. Defendant said that he had placed the gas cap alongside of the can.

Soon afterwards, Vickie told him to hurry up because the gasoline was starting to burn. He took a cigarette out of his shirt and struck a match. When Vickie asked him what he was doing, he said, "oh, shit," and then blew the match out and tossed it over his back towards the family room. The kitchen then went up in flames. As the fire was blazing,

defendant rolled toward the family room and Vickie rolled towards the kitchen cabinets. Defendant's clothes were aflame but he managed to extinguish them. Then he went into the kitchen and tried to put out the fire there. An explosion occurred and the flames got higher. He then ran outside and asked several neighbors for help.

When defendant returned, he crawled through the front door into the family room. He yelled to Vickie and she told him she was in the kitchen by the dishwasher. Defendant could not enter the kitchen, so he went into the patio and threw a brick through the kitchen window, hoping to enter the kitchen through the window. Nonetheless, he could not enter because there was an excess of glass around the window. He then went to the back of the garage and kicked in the door. He entered the kitchen and managed to drag Vickie to the doorway before he had to go back outside for some more fresh air. At this point, he heard banging on the front garage door and he went over to open it. When he returned to get Vickie, another man was already carrying her outside. After Vickie was safely out of the house, defendant went into the backyard and sprayed some water on his hand and leg. He said that he could not remember much of what happened after this.

Sometime later, defendant went over to where Vickie was lying and he told her that he was sorry. She responded that she was going to die, but he tried to assure her that she would live. A police officer came over, and asked defendant if he was Vickie's husband, and then asked defendant to come with him. He was placed in a squad car and then taken to the police station. During the trip, defendant asked the officer if they were going to a hospital and the officer told him that they were going to the station to ask him a few questions.

When they arrived at the police station, defendant was placed in the interrogation room and asked about what had happened by a number of people. He told them that he wanted to see an attorney and complained about being cold and about his hand hurting. He said that he was coughing up smoke. One of the officers told him, "We'll see about it later." Eventually, defendant gave his statements to Officer Ott. He said that he gave a written statement because "it was the truth and he wanted them to know what had happened so he could see his wife." When asked why he did not mention pouring gasoline on the floor in his statement, he said that he skipped over a lot of things. He recalled signing a waiver before giving his written statement, but he could not remember reading it.

Defendant said that he was questioned off and on all night on July 17. He believed that he was interviewed by Kjellstrom in a little house behind the police station. He did not tell Kjellstrom about the gasoline because he did not want to talk to a police officer; he wanted to talk to an attorney.

Later in the evening on the 17th, the police officers took his clothing and gave him some clothing which they had found in his apartment. The police also gave him a blanket because he said he was cold.

At about 9 a.m. on July 18, defendant was taken to a hospital for treatment of blisters on his hands and shins. The blisters began appearing as early as 7 p.m. on July 17. He said that he did not seek treatment for one of the burns on his hands prior to this visit to the hospital. On a later date, he was again treated for his burns. On that occasion some skin was cut off and salve was placed on the wound. He was also given some pain pills.

At 1 p.m. on July 18, Officer Ott asked defendant if he wanted to talk about what had happened. When defendant said that he did not want to talk, Ott asked him if he realized that he could get the electric chair for what he had done. He also told defendant:

"You're a very sick boy. You need help. We can help you get that help. * * * Do you want to talk to us? * * * Well you should. Your wife died about fifteen minutes ago."

When defendant heard that his wife had died, he became upset and began crying.

Later that evening, defendant spoke with Assistant State's Attorney Griffith. He admitted telling Griffith that he had not taken any pills on July 17, but explained that the L.S.D. was not in pill form. He also admitted telling Griffith that he had only three or four beers on that day, but stated that he was pretty distraught and confused when he had told him this. He also testified that he had been smoking marijuana, even though he told Griffith that he had not.

On July 22, defendant became very depressed and disoriented and was placed in the psychiatric ward of Cermak Memorial Hospital. While there, he once attacked a coffee pot with a metal pipe and on more than one occasion, he was placed in leather restraints, once for as long as a week.

Doctor Paul Cherian, a part-time psychiatrist at Cermak Hospital, testified that he examined defendant on July 22, 1976. As a result of this examination, his diagnosis was that defendant was suffering from psychotic depression and could not function effectively in a social setting. After this examination, Cherian admitted defendant into the hospital and began treating him with a major tranquilizer. He also ordered that a "draw a person" test be given defendant. Defendant took the test and drew a picture of a hand coming out of a tomb. He told Cherian that the picture represented his wife inviting him to join her. Cherian stated that his analysis of the drawing indicated that defendant was depressed and had some suicidal tendencies.

Cherian stated that when defendant first entered the hospital, he

covered his head with a sheet and would not talk. Early in his period of hospitalization, defendant began having hallucinations, hearing his wife's voice asking him to join her and hearing another voice saying that he was going to be killed unless he killed himself. At one point, defendant attempted suicide and he had to be placed in leather restraints on more than one occasion. Two weeks after defendant's admission, Cherian diagnosed defendant's condition as schizophrenia schizoaffective, a mental illness characterized by abnormal thought processes. He said that in his opinion defendant was not faking his condition and, at the time of his admission, defendant was insane.

Helen Jarosz, a registered nurse at Cermak Hospital, testified that defendant did engage in a pipe swinging incident while he was at Cermak Hospital. She stated that he had been placed in leather restraints on a number of occasions for his own safety. Anne Edwards, a graduate nurse at Cermak Hospital, testified that she gave defendant antidepressant drugs during his hospitalization. Mary Richardson, a registered nurse and supervisor of the psychiatric unit at Cermak Hospital, testified that defendant was depressed and uncommunicative during his hospitalization. She also stated that he once cut his wrists.

Doctor Werner Tuteur, a licensed psychiatrist, testified that he examined defendant for about an hour and a half on November 13, 1976. His diagnosis was that defendant was genuinely schizophrenic, chronic undifferentiated type. Tuteur based his diagnosis on observation of defendant during the examination, information provided by defendant during the examination, and information provided by medical records of defendant's previous hospitalizations. In particular, Tuteur noted that during the examination, defendant was very loosely organized, had difficulty following a logical stream of thought, was not always in contact with reality, had a strange attitude toward Vickie's death—he said drugs did it, and acted as if he were some kind of hero. He said that defendant had told him about his military career, his psychiatric and drug problems, his past marriage and his actions on July 17. Defendant told Tuteur that prior to the fire, he loaded up on drugs "without end," and subsequently poured gasoline on Vickie. Tuteur also indicated that he had looked at medical records of defendant's hospitalizations at St. Theresa, Chicago Read, Northwest Community, and Cermak Memorial.

Tuteur stated that it was his opinion that on July 17, 1976, a man with characteristics similar to defendant's would be suffering from schizophrenia. He noted that even though defendant had been treated for schizophrenia since the incident, the condition still persisted. He also stated that it was his opinion that on July 17, a man with characteristics similar to defendant's would lack the substantial capacity to realize the criminality of his act and he would not be able to conform his conduct to

the requirements of law. He noted that schizophrenia often leads to drug use and is often manifested by the making of contradictory statements.

## C. STATE'S REBUTTAL

Carol Reiter testified that defendant was not present at her home on the day on which she left for her vacation and that she never gave defendant permission to stay at her house. She said that she initially disapproved of her daughter's marriage to defendant only because of her daughter's age. Although she was not aware of all of defendant's past hospitalizations, she considered defendant to be sane.

Officer Dale Ott testified that when he interviewed defendant at 6 p.m. on July 17, defendant did not appear to be under the influence of alcohol. He said that on July 18, he went to defendant's apartment and found a plastic bottle of rubbing alcohol in the bathroom vanity. He said that based on the five interviews which he had with defendant after the July 17 incident, he believed defendant to be sane.

Officer Mark Kjellstrom testified that during the July 17 interview, defendant told him that he had gone to a restaurant for breakfast earlier in the day. Defendant also had indicated that when he returned from Deer Grove Forest Preserve, he watched an Abbott and Costello movie. Kjellstrom stated that defendant did not appear to be under the influence of alcohol on July 17, and he appeared to be sane on every occasion when he spoke with him.

Susan White, a social friend of defendant, testified that she believed that he was perfectly sane.

Doctor James Spicer, director of the Camelot Care Center for emotionally disturbed children and adolescents, testified that defendant had been employed as a maintenance man with some major responsibilities at the Center for the seven months prior to the July 17 incident. He said that he saw defendant daily and characterized defendant as a "very good, very reliable, and responsible" worker who functioned within normal ranges. Spicer, a psychologist, believed that defendant was sane when he observed him. Wayne Greene, the assistant director and business manager at Camelot Care Center, said that defendant was in charge of maintenance and had a good punctuality record. Based on defendant's performance of many tasks, some of which required independent thought, and conversations which he had with defendant, Greene believed defendant to be sane.

Doctor Frank Lorimer, a psychiatrist, testified that he examined defendant for about an hour on both January 12 and January 18, 1977, pursuant to a court order to determine whether he was competent to stand trial and whether he was sane on July 17. His diagnosis was that

defendant had a personality disorder with a subcategory of inadequate schizoid personality. Lorimer based his diagnosis on personal observations of defendant during the examination, information provided by defendant, defendant's history of hospitalizations—including the absence of any hospitalization between November of 1973 and July 17, preliminary reports, past examinations, police reports, and tests which he authorized. He noted that on both January 12 and January 18, defendant was in good contact with reality, was generally cooperative, and behaved within normal limits. He also noted that defendant did not relate any auditory or visual hallucinations, although he often thought he heard his wife's voice as he was falling asleep.

Lorimer stated that defendant related several episodes which indicated a sadistic and unsocialized nature. Defendant told him that at age 10, he set a chicken coop on fire. Between the age of 13 and 15, he placed frogs in a tub or container of water with gas or some other inflammable material on the surface, set the bucket on fire, and watched the frogs jump around and die. Between the age of 16 and 17, he put dogs and cats in a river or creek and when they struggled to get out he shot them with a rifle. He said that at one time he shot as many as 11 animals. When he was in the army, he set fire to the barracks and, while in a stockade, he attempted to slit his wrists. After his release from the army, he attempted suicide on a number of occasions and became involved in drug abuse. He also told Lorimer that he engaged in a number of sadomasochistic sex practices. Although Lorimer characterized these practices as sadistic, he said that sadism has no direct relationship to a specific mental illness, but that it had a relationship to a personality disorder.

After a lengthy hypothetical question based on the defendant's history and activities on July 17, Lorimer indicated that the man would have been sane on July 17. He also believed that the man would have had the substantial capacity to appreciate the circumstances of his acts and to conform his conduct to the requirements of the law.

OPINION

I

Defendant contends that the trial court erred in admitting into evidence the custodial statements which he made to law enforcement officials because the statements were tainted by Officer Ott's unconstitutional promise and by defendant's poor mental, emotional, and physical condition. He argues that the error was not harmless beyond a reasonable doubt and thus, he is entitled to a new trial. We agree.

■■ A statement must be voluntarily made in order to be admissible at

trial. (*People v. Peck* (1974), 18 Ill. App. 3d 112, 309 N.E.2d 346.) The determination of voluntariness involves a review of all of the relevant circumstances surrounding the making of the statement. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The relevant circumstances include: the existence of any promises, threats, or physical coercions; the length and intensity of the interrogation; and the age, intelligence, experience, and physical condition of defendant. (*People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50.) A reviewing court will not reverse a trial court's finding of voluntariness unless the finding is against the manifest weight of the evidence. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The trial court's finding that all of defendant's custodial statements were voluntary was against the manifest weight of the evidence.

Defendant's custodial statements which were admitted into evidence included: his July 17 written and oral statements to Officer Ott; his July 17 oral statement to Officer Kjellstrom; his July 18 oral statement to Officers Ott, Kjellstrom and Winkelhake; and his July 18 written statement to Assistant State's Attorney Griffith. At the preliminary hearing on defendant's motion to suppress the custodial statements, he testified that he had not given any statements on July 17 until Officer Ott told him:

"Well, you need help. And if you talk to us we'll see that you get some help. * * * [w]e think that you're sick."

After Ott had said this, defendant first gave an oral and then a written statement to Ott. Shortly after defendant gave his written statement, he was interviewed by Officer Kjellstrom for about three hours and he gave Kjellstrom an oral statement. About two-thirds of the way through the Kjellstrom interview, Ott returned and defendant then gave Ott another oral statement. At about 1:30 p.m. the next day, defendant gave another oral statement to Ott and at about 6:30 p.m., defendant gave a written statement to Assistant State's Attorney Griffith. Officer Ott testified both at the preliminary hearing and the trial, but he never once directly contested the making of the alleged promise. Despite his failure to do so, the trial court found that "[t]here were no promises of leniency or sympathy, no threats of force or physical harm to encourage [defendant's] confession," and denied defendant's motion to suppress.

■■ In *People v. Peck* (1974), 18 Ill. App. 3d 112, 309 N.E.2d 346, we reversed and remanded a conviction where the prosecution failed to offer evidence contradicting defendant's testimony that his "generally incriminating" statement was induced by threats and promises of leniency. In *Peck*, we noted that "[i]t was improper for the trial court to disregard defendant's uncontroverted testimony." (18 Ill. App. 3d 112, 116, 309 N.E.2d 346, 349. See also *People v. Mrozek* (1977), 52 Ill. App. 3d 500, 367 N.E.2d 783; *People v. McClure* (1976), 43 Ill. App. 3d 1059, 358

N.E.2d 23.) In the instant case, we also believe that it was improper for the trial court to disregard defendant's uncontroverted testimony.

The State argues that "it was not necessary that the defendant's allegation concerning the remark by Ott be contradicted for the [trial] court to form the opinion that the defendant lied about the remark." We disagree with this argument. Although we would like to believe that Officer Ott did not make the promise, there is nothing in the record to dispute the promise. Officer Ott was in a unique position to rebut the charge that he made a promise to defendant since he testified both at the preliminary hearing and at the trial; yet, he never rebutted defendant's testimony. We believe that his failure to rebut the charged promise only lends credence to defendant's charge. Further, we note that the trial court did not specifically find defendant's testimony unbelievable. It merely found: "that the defendant was acequately [*sic*] warned, that he was not under any pressure of pain of a sufficient degree to cause—so as to break his understanding of what he was saying. There was [*sic*] no promises of leniency or sympathy, no threats of force or physical harm to encourage confession on the defendant." These findings indicate only that the trial court disregarded defendant's uncontradicted testimony. This was improper under *Peck*.

We also disagree with the State's argument that *Peck* is distinguishable from the instant case. In *Peck*, the State did not present any evidence on the voluntariness of the statement. There we noted:

> "In the instant case defendant's testimony about how he would be cut loose or allowed to go home was uncontroverted. Neither of the two police officers who were allegedly present during the taking of the written statement was called as a witness. It was improper for the trial court to disregard defendant's uncontroverted testimony." (18 Ill. App. 3d 112, 115-16, 309 N.E.2d 346, 349.)

Our emphasis was clearly on the uncontradicted nature of defendant's testimony regarding the promises rather than on the State's failure to present any evidence at all. In *Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336, the United States Supreme Court dealt with a situation similar to the one presented by the instant case. In that case, the police officers who witnessed the making of a statement by defendant testified at trial, but failed to refute defendant's version of what had transpired during the interrogation. In vacating and remanding defendant's conviction, the *Haynes* Court noted:

> "[W]e cannot but attribute significance to the failure of the State, after listening to the petitioner's direct and explicit testimony, to attempt to contradict that crucial evidence; this testimonial void is the more meaningful in light of the availability and willing

cooperation of the policemen who, if honestly able to do so, could have readily denied the defendant's claims." (373 U.S. 503, 510, 10 L. Ed. 2d 513, 519, 83 S. Ct. 1336, 1341.)

Similarly, we cannot but attribute significance to Officer Ott's failure to refute defendant's claim that the promise was made to him.

In addition to the uncontroverted testimony about Ott's promise, there are other circumstances which indicate that the finding that defendant's July 17 statements were voluntary was against the manifest weight of the evidence.[1] We are particularly disturbed by the delay in taking defendant to the hospital for treatment of his burns. Although the police officers testified that they did not see any burns, blistering or shivering by defendant, or hear any request for medical assistance by defendant, other testimony casts doubt upon their testimony. Officer Ott testified that he interviewed defendant twice for a total of two hours on July 17 and the most he could say was that defendant's hair was singed and his hands appeared dirty. Defendant spent about 50 minutes of this time writing out a statement, thus giving Officer Ott a good opportunity to observe defendant's hand. Officer Kjellstrom testified that he interviewed defendant for three hours on July 17, and the most that he could say was that his hands were dirty. Kjellstrom did indicate, however, that defendant complained of "stinging" in his hands and his thighs, but that defendant declined medical assistance. Their testimony was contradicted by defendant who indicated that he had immediately asked to see a doctor and also indicated that his hands began to blister about an hour after he had arrived at the police station. James Marton, a neighbor of the Reiters testified that when he saw defendant for a short time in the Reiters' backyard on July 17, he noticed that defendant's hair, eyebrows, and hands were burned. Lieutenant William De Pue of the Palatine Fire Department testified that when he saw defendant just after the fire had been extinguished, he noticed that defendant's hair was damaged and that his hands were blistered. Additionally, Doctor Vincent M. Greco, who treated defendant on July 18, testified that defendant had mostly first degree burns with some second degree burns on both hands and that three quarters of the top of defendant's left hand was burned. He indicated that the burns were visible to the naked eye. Doctor Barry Mizock, who treated defendant's burns on July 19, testified that first degree burns often develop into second degree burns and that second degree burns usually blister within an hour. We believe that all of this unimpeached testimony raises a serious doubt as to whether Officers Ott and Kjellstrom were not aware that defendant had suffered injuries from the fire.

---

[1] Although the finding of voluntariness was made after testimony was heard on the motion to suppress, we, as a reviewing court, may consider the whole record, including trial testimony, in making our determination. (*People v. Rendleman* (1978), 57 Ill. App. 3d 459, 373 N.E.2d 509.)

Furthermore, we think it strange that defendant was given a blanket sometime on July 17, even though none of the police officers could recall seeing defendant shivering. We also think it strange that defendant should be taken to a hospital only after spending a night in a jail cell. No explanation was given why he could not have been treated after the last interview on July 17, and we believe that leaving him in jail overnight further suggests that he was not treated properly. Exacting statements by delaying treatment to an injured individual is certainly as brutal as physically coercing the giving of a statement.

■■ Insofar as the July 18 statements are concerned, we believe that they were tainted by the illegal procurement of the July 17 statements. (See *People v. Thomlison* (1948), 400 Ill. 555, 81 N.E.2d 434.) Defendant's written statement to Griffith is directly linked to his July 17 statements by his testimony that he gave the statement to Griffith because he had made a statement earlier (the July 17 written statement) and he did not figure that he had anything to lose. Also, Officer Ott, who had made the uncontroverted July 17 promise to defendant was present during the giving of this statement. Ott was also present for defendant's earlier statement on July 18. Even though defendant gave both of the statements after he had been treated for his burns, we believe that Ott's promise was still viable because it could have been interpreted to include more than just medical assistance. A further reason for our belief that the court's finding of voluntariness on the earlier July 18 statement was against the manifest weight of the evidence was the fact that the statement was given only thirty minutes after defendant had been confronted with the emotionally unsettling news that his wife had died. Ott even testified that when defendant heard that his wife had died, he appeared shaken and began pounding his hands on the table and his head on his hands. Statements given when emotionally upset may be involuntary. *People v. Mrozek* (1977), 52 Ill. App. 3d 500, 367 N.E.2d 783.

The State argues that the trial testimony indicates that the "alleged" promise was made on July 18 and that as a result, the July 17 statements were not influenced by the promise. Although defendant did testify that Officer Ott made a promise to him at about 1 p.m. on July 18, his testimony does not detract from his preliminary hearing testimony that a promise was made on July 17. Despite defendant's trial testimony, his preliminary hearing testimony was never controverted. In fact, defendant's trial testimony about the July 18 promise likewise was never controverted. Thus, defendant's testimony could be interpreted to mean that a second promise had been made to him on July 18 to induce him to make a statement. Such a promise would lend further support to our conclusion that the trial court's finding of voluntariness with regards to the July 18 statements was against the manifest weight of the evidence.

■■ Having decided that none of defendant's statements should have

been admitted into evidence, we must next decide if the error in admitting the statements requires a reversal and remand. Defendant argues that the introduction at trial of a coerced confession can never be harmless error. (*Payne v. Arkansas* (1958), 356 U.S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844.) Although we do not disagree with this rule of law, we do not believe that any of defendant's statements can be characterized as a confession. The statements, while admittedly damaging, do not go so far as to admit guilt. (*People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618.) We believe that the proper standard to apply is to ask whether the error in admitting the statements was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) In applying this standard to the instant case, we find that the error was not harmless beyond a reasonable doubt. Defendant's statements were used by the State in numerous attempts to impeach defendant's credibility and were repeatedly alluded to by the State in its closing arguments. Considering the extent to which these statements were used and the fact that these statements contained information which could have been damaging on questions of guilt and sanity, issues raised but not decided in this appeal, we believe that it would be proper to reverse and remand on this issue.

## II

Although we dispose of this case on the basis of our resolution of the first issue, we will consider several other issues raised by defendant because they may reappear at the new trial.

Defendant contends that the trial court abused its discretion in refusing to admit certain sexually explicit pictures of Vickie and him into evidence. At trial, defendant testified that he and Vickie liked to show each other nude photographs of themselves while they were engaging in sex. He argues that the photographs should have been admitted into evidence because the photographs were evidence of their unusual sexual practices. He states that if this "evidence" had been admitted, his explanation of the events leading up to the fire would have been more believable. We reject defendant's contention.

The trial court's decision to not admit the photographs was based on its belief that the photographs only would be material "if they would bear upon the question of whether the defendant engaged in an act of bondage in the early afternoon hours of or the late afternoon hours of July the 17th, 1976." "As for issues of relevancy and materiality, the trial court has a 'wide scope for decision' and may reject evidence which it determines to be of little probative value because of its remoteness, uncertainty, or conjectural nature." (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 537,

362 N.E.2d 14, 20.) Reversal of a trial court's decision will only occur when the decision results in prejudice to the defendant. 47 Ill. App. 3d 529, 537, 362 N.E.2d 14, 20.

■■ Although the photographs might have some probative value on the question of whether Vickie and defendant engaged in unusual sexual practices, we do not believe that the court's decision to not admit them into evidence so prejudiced defendant as to warrant a reversal on this basis alone. The photographs, as described by defense counsel in the record, merely depict the naked bodies of defendant and Vickie. They do not depict Vickie and defendant engaged in any unusual sexual activity. Thus, they do not directly support defendant's testimony that he and Vickie engaged in unusual sexual activities, let alone support his explanation of the events preceding the fire. Being so remotely related to the crucial issues in this case, we cannot say that the trial court abused its discretion on this issue.

Defendant next contends that the trial court erred when it prevented defense witness Doctor Tuteur from testifying as to the psychiatric diagnoses which he considered in forming his expert opinion that defendant was insane. During his testimony Doctor Tuteur indicated that his opinion that defendant was insane was partially based upon medical records of defendant's hospitalizations at St. Theresa, Chicago Read, Northwest Community, and Cermak Memorial. The trial court refused to allow him to testify as to the diagnoses contained in those records, over defendant's objections. Defendant argues that the trial court erred in refusing to allow such testimony and relies upon the decision of the Illinois Supreme Court in *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171. The State also relies on *Ward* for its position that a psychiatric expert can testify that he or she has used other medical records as factors in formulating an opinion as to an accused's insanity, but cannot testify as to the contents of those records because such testimony would be hearsay. Although we believe that *Ward* is unclear in its pronouncements, cases which have interpreted *Ward* clearly indicate that psychiatric experts may testify as to the contents of records upon which they rely in formulating their opinions. On the basis of this elucidation of *Ward*, we agree with defendant's contention.

In *Ward*, a psychiatric expert testified that it was his opinion that the accused was sane at the time of the crime. He partially based his opinion on medical reports from other institutions. He also testified that he had supervised an examination of the accused by another doctor and, over defense objection, he read to the jury a letter written by this doctor. The letter stated that it was the doctor's opinion that the accused was legally sane at the time of the alleged offense. On cross-examination, the defense questioned the psychiatric expert on matters contained in the reports

from other institutions. Eventually, the defense urged that all of the records relied upon by the psychiatric expert, including the letter, be admitted into evidence. The supreme court stated that there was no error in permitting the psychiatric expert to testify as to the accused's sanity since all of the reports he relied upon were admitted into evidence. Additionally, the court noted that even if the records had not been admitted, there would not have been any error in allowing the psychiatric expert to express his opinion as to the accused's sanity based, in part, on the records. The *Ward* court recognized that part of its holding would be overruling *People v. Black* (1937), 367 Ill. 209, 10 N.E.2d 801, but noted that "[i]f such reports are of a type customarily utilized by the medical profession, then these reports may be used as factors by an expert in the determination of his opinion as to an accused's sanity even though the reports are not admitted into evidence. The restriction that these materials be commonly used by the medical profession attributes a high degree of reliability to them." 61 Ill. 2d 559, 568, 338 N.E.2d 171, 177.

The problem in understanding *Ward* is that in overruling *Black*, the court was overruling a case in which there was no question as to whether a psychiatric expert could testify as to the content of records relied upon in formulating an opinion. The *Black* case involved the question of whether a medical expert could testify as to an opinion based on matters contained in reports which were not told to the jury. The *Black* court said that such testimony would be improper, noting:

> "The doctor necessarily weighed these statements. They were among the component factors from which his opinion was created and expressed upon a contested issue in the case. In exercising the function of weighing the evidence, a part of the foundation on which his opinion rested, he invaded the province of the jury." (367 Ill. 209, 211-12, 10 N.E.2d 801, 802.)

The *Ward* court's decision overruled this holding and also stated that a psychiatric expert could testify as to the content of these reports. We believe that this message is explicit in the court's finding that the psychiatric expert's testimony based on all the records, including the letter which he read to the jury, would have been proper even if defendant had not moved to have the records admitted into evidence.

■■ Cases interpreting *Ward* have reached a similar conclusion. (*People v. Cooper* (1978), 64 Ill. App. 3d 880, 381 N.E.2d 1178; *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 376 N.E.2d 464; *Clemons v. Alton & Southern R.R. Co.* (1977), 56 Ill. App. 3d 328, 370 N.E.2d 679; *People v. Espinoza* (1977), 54 Ill. App. 3d 36, 369 N.E.2d 325; *Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10. Contra, *In re Smilley* (1977), 54 Ill. App. 3d 31, 369 N.E.2d 315.) In two of these cases, the court noted that a psychiatric expert's testimony on the contents of the reports is to be

considered an exception to the hearsay rule. (See *Clemons* and *Smith*.) A commentator, however, has disagreed with this approach and suggests that this type of testimony is to be considered nonhearsay testimony admitted for the limited purpose of demonstrating how the testifying expert formulated his opinion. (R. G. Spector, *People v. Ward: Toward a Reconstruction of Expert Testimony in Illinois*, 26 De Paul L. Rev. 284 (1977).) Nonetheless, whichever characterization is used, testimony by a psychiatric expert on the contents of medical records relied upon in formulating an opinion is permissible. Thus, the trial court erred when it prevented Doctor Tuteur from giving such testimony.

Lastly, defendant contends that the trial court erred when it failed to give special verdict forms of not guilty by reason of insanity as to each offense charged. The trial court gave the jury six verdict forms: guilty of murder, guilty of arson, guilty of involuntary manslaughter, not guilty, insane and still insane, and insane and recovered. The defense did not object to these verdict forms or tender any alternate forms. Nonetheless, defendant argues that the trial court committed reversible error by failing to give insanity verdict forms as to each offense. We agree that the trial court erred, but we believe that the error was waived.

When the defense of insanity is raised during a trial, the trial court is required to provide the jury with special verdict forms of not guilty by reason of insanity *as to each offense charged*. (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(j).) The failure to so instruct the jury is error. (*People v. Lipscomb* (1977), 46 Ill. App. 3d 303, 360 N.E.2d 988.) Nonetheless, like other trial errors, a failure to make a timely objection to the verdict forms normally constitutes a waiver. (See *People v. Smith* (1978), 71 Ill. 2d 95, 374 N.E.2d 472.) Since defendant failed to object to the giving of the erroneous verdict forms, his contention is waived.

Even if defendant had objected at trial, however, we doubt that the error committed by the trial court would be harmful. Unlike the case relied upon by defendant (*People v. Lipscomb* (1977), 46 Ill. App. 3d 303, 360 N.E.2d 988), the offenses charged in the instant case all arose out of the same act. Though we believe that it was within the realm of possibility for the jury to find defendant insane as to one of the offenses and sane as to the other offense, we believe that the possibility would be so slim as to warrant a finding that the error in not giving separate verdict forms was harmless.

Reversed and remanded.

LORENZ and MEJDA, JJ., concur.